**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Juan R. SALAZAR, Defendant–**
**Appellant.**

**No. 92–1021.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 9, 1992.
Decided Jan. 6, 1993.

Rodger A. Heaton, Asst. U.S. Atty. (argued), Springfield, IL, for plaintiff-appellee.

Stanley N. Wasser (argued), Feldman & Wasser, Springfield, IL, for defendant-appellant.

Before POSNER and COFFEY, Circuit Judges, and SHADUR, Senior District Judge.*

SHADUR, Senior District Judge.

After Juan R. Salazar ("Salazar") was convicted by a jury of two drug offenses—one count of conspiring to distribute cocaine and one substantive count of possessing cocaine with the intent to distribute it—he was sentenced to a concurrent prison term of 169 months on each count. On this appeal Salazar challenges the sufficiency of the evidence on both counts and also argues that the district court erred by attributing 15 kilograms of cocaine to him in calculating his sentence under the United States Sentencing Guidelines ("Guidelines"). We affirm the conviction and sentence in all respects.

*Background*

After informant Louis Isirov had alerted the Drug Enforcement Agency ("DEA") that Salazar had supplied him with cocaine, the DEA taped conversations between the two and arranged for Salazar to meet undercover DEA agent John Schaefer ("Schaefer") at a motel in Carlinville, Illinois. At that meeting Schaefer posed as a drug buyer and investor, while other agents posed as Schaefer's workers. In the course of the tape-recorded meeting Salazar said that he had a large marijuana supplier in Mexico and a large cocaine supplier in Florida, and that Schaefer would have to travel to Florida to obtain cocaine.

Schaefer, this time accompanied by DEA agent Dan Stitt, next met Salazar a few days later in Miami. There Salazar introduced the agents to his cocaine source Alvaro Jaramillo ("Jaramillo"). With Salazar there throughout the meeting, Jaramillo

* The Honorable Milton I. Shadur, of the North-ern District of Illinois, is sitting by designation.

and Schaefer discussed both the price and availability of cocaine. Jaramillo told Schaefer that he could obtain cocaine in 400 to 500 kilogram shipments at $19,000 per kilo F.O.B. Florida ($5,000 more per kilo if Schaefer required Illinois delivery), but that he would need at least three days' notice to arrange delivery. To facilitate further contact Schaefer gave Jaramillo his beeper number, and Jaramillo offered up Salazar's telephone number for Schaefer's use in any further communications.

After Schaefer returned to Illinois he had a number of telephone conversations with Salazar to arrange a further meeting at which Schaefer would purchase a cocaine sample. Schaefer, this time accompanied by agent Kelly Cain ("Cain"), then returned to Florida to meet with Salazar and Jaramillo. After that meeting Salazar and Jaramillo tried to arrange for the cocaine delivery but were unsuccessful because—as they told Schaefer—their source was occupied in unloading a shipment of cocaine up the coast. Success in securing the cocaine did not come the next day either, and Schaefer then agreed to fly back to Illinois and to take delivery in Chicago.

Again a number of phone conversations followed Schaefer's return to Illinois, as the result of which Schaefer agreed to buy 30 kilograms of cocaine from Salazar and Jaramillo if they were able to deliver the drugs in Chicago. Later Salazar and Jaramillo did locate cocaine in Chicago, so they notified Schaefer and negotiated for the delivery in Springfield, Illinois of several shipments of 3 to 5 kilograms each.

Before the planned Springfield delivery, agents in Chicago watched Salazar and Jaramillo drive to a gas station. Once there Jaramillo—together with an unidentified person—entered a different car and drove around the block. Agents then observed Jaramillo leave the car while carrying a brown shoe bag and then return to the first car where Salazar was waiting. From there Salazar and Jaramillo drove back to the hotel where they had stayed, then left for Springfield.

In Springfield Jaramillo (who was driving) and Salazar went to a parking lot to meet agents Schaefer and Cain. Cain walked toward the passenger's side of the car, while Schaefer approached the driver's side. Through the car window Schaefer saw a shoe bag on the floor beneath Jaramillo's feet. Each of Salazar and Jaramillo said that "they" had brought the cocaine, and both of them asked whether Schaefer had the purchase price. Schaefer responded that he had the money across the street and left, purportedly to get it.

Instead a prearranged arrest signal was given, and other law enforcement officials arrested Salazar and Jaramillo, seizing the shoe bag. They found that the bag contained one kilogram of 97% pure cocaine in a type of packaging that suggested direct delivery from the manufacturer.

With that evidence before the jury, Salazar was found guilty on both the conspiracy count and the substantive drug count. At sentencing Salazar contested the attribution to him in the presentence investigation report, for Guidelines purposes, of 15 kilograms of cocaine. That argument was rejected by the district judge, who sentenced Salazar at the midpoint of the 151–month to 188–month range established by that reading of the Guidelines. Salazar filed a timely notice of appeal from his conviction and sentence, and we have jurisdiction pursuant to 18 U.S.C. § 3742(a)(2) and 28 U.S.C. § 1291.

### Evidentiary Sufficiency

■ As to Salazar's challenge to the sufficiency of the evidence, he confronts a familiar and extraordinarily difficult hurdle: Our inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1978)). That inquiry permits of only one answer—an affirmative one—as to each of the two charges.

### 1. Conspiracy

■ We treat with the conspiracy count first, and it need not long detain us. Con-

spiracy under 21 U.S.C. § 846 is simply an agreement between two or more individuals to commit an offense in violation of the Controlled Substance Act. To establish that agreement the government must prove beyond a reasonable doubt that the defendant both knew of the conspiracy and intended to associate himself or herself with the criminal scheme (*United States v. Sullivan,* 903 F.2d 1093, 1098 (7th Cir. 1990) exemplifies a myriad of cases so holding). And such proof is frequently contrasted with the type of lesser showing that will not suffice—a contrast that we expressed in *United States v. Paiz,* 905 F.2d 1014, 1020 (7th Cir.1990) (citations omitted):

> Evidence of "mere association with conspirators, knowledge of the conspiracy, and presence during conspiratorial discussions," without more, will not do the trick. Evidence must be presented "to support the inference that the defendant in some way joined and participated in the conspiratorial scheme."

█ It would be difficult to imagine a less promising case than this one for launching an attack on a conspiracy conviction. Salazar was intimately connected with the contemplated major dealings in cocaine from the time he introduced Agent Schaefer to Jaramillo, continuing through the numerous discussions about shipments and sales of the drugs (indeed, the record contains fully 57 telephone conversations involving Salazar in addition to the several face-to-face meetings), and ultimately culminating in the delivery of one kilogram that was aborted only by the arrest signal that caught Salazar and Jaramillo in the agents' net. On this record any acquittal could only have reflected an act of juror nullification.[1]

**2. Possession with Intent To Distribute**

Though Salazar concedes that the concept of constructive possession suffices to sustain a conviction for narcotics possession under 21 U.S.C. § 841(a)(1) (see, e.g., *United States v. Briscoe,* 896 F.2d 1476, 1522 (7th Cir.1990)), he maintains on appeal that he should not be held accountable for the one kilo that was actually seized and that hence underpins Count 2. In essence he argues that it was Jaramillo who controlled the cocaine, and that it would be improper—based on a constructive possession theory—to convict Salazar, who neither owned nor drove the car in which the contraband was found. Again we see no reason to disturb the jury's rational conclusion that Salazar too "possessed" the cocaine.

In candor, we are puzzled by any need to explore the often murky waters of constructive possession to begin with. In light of the open and shut nature of the conspiracy charge, this case would have seemed a most obvious candidate for a *Pinkerton* approach (*Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)), under which co-conspirator Jaramillo's unquestioned direct possession of the cocaine would also support Salazar's conviction on the substantive charge of possession with intent to distribute. But for whatever reason, the jury instructions did not present the easy *Pinkerton* alternative route to a guilty finding on that charge. And of course we are not about to rewrite the history of the case on that score—in that respect Robert Frost's *The Road Not Taken* certainly delivers the right message for appellate review of criminal cases.

There is however a path that *was* marked out for the jury and that supports Salazar's conviction without our having to examine the legal meaning of "possession." Drawing on Instruction 5.08 of the form instruc-

---

1. Mindful of his obligations to the justice system as well as to his client, Salazar's able appointed counsel disclosed in his opening brief—consistently with the principle announced in *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967)—that the challenge to the conviction on the conspiracy count was being asserted on Salazar's directive even though counsel saw no merit in it. Counsel then pro-

ceeded to do the best he could with the meritless contentions in that respect. Thus counsel put the best face possible, at Salazar's behest, on the argument that Salazar was continually intoxicated so as to preclude formation of the requisite criminal intent—an issue that the district court submitted to the jury with a proper instruction, and that the jury obviously and rationally rejected by its guilty verdict.

tions drafted by the Committee on Federal Criminal Jury Instructions of the Seventh Circuit (1980), the jury instructions in this case contained this unexceptionable statement of aider-and-abettor law:

> Any person who knowingly aids, abets, counsels, commands, induces or procures the commission of a crime is guilty of that crime. However, that person must knowingly associate himself with the criminal venture, participate in it, and try to make it succeed.

 It is permissible to charge a defendant as a principal (as Salazar was in Count 1 here) and to convict him or her as an aider and abettor even though the indictment has made no reference to 18 U.S.C. § 2 (*United States v. Moore*, 936 F.2d 1508, 1526–27 (7th Cir.1991)). And the evidence here overwhelmingly supports all the necessary elements of such aider-and-abettor responsibility: (1) Jaramillo had possession of the cocaine intending to distribute it, (2) Salazar committed acts that encouraged or assisted Jaramillo in committing that offense and (3) Salazar himself had the requisite intent to aid in that commission (see such cases as *United States v. Rodriguez*, 831 F.2d 162, 167 (7th Cir.1987) and *United States v. Molinaro*, 877 F.2d 1341, 1349 (7th Cir.1989), each upholding drug convictions on an aider and abettor theory as an independent alternative to the doctrine of constructive possession).

 Having said that, however, we should not be misunderstood as harboring any doubts on the application of constructive possession principles to Salazar, the subject to which the parties have devoted their principal discussion. Constructive possession theory allows a finding of narcotics possession even though the defendant did not possess the drugs in the literal physical sense (see, e.g., *United States v. Gutierrez*, 978 F.2d 1463, 1470 (7th Cir. 1992)). To establish constructive possession the government must demonstrate that the defendant was able and intended to exert control over the narcotics—that is, had the power and intent to possess them (*Molinaro*, 877 F.2d at 1348). And for that purpose the law expressly recognizes the concept of joint possession (*United States v. Perlaza*, 818 F.2d 1354, 1361–62 & nn. 3–4 (7th Cir.1987)), as the district court properly instructed the jury here.

Though at the time of arrest the cocaine in the car was on the floor beneath Jaramillo's feet, and thus next to Salazar's, surely the jury could rationally find that they jointly controlled the drugs. Salazar helped to arrange the sale, knew the cocaine was in the car (indeed, *each* of Salazar and Jaramillo told Schaefer that "they" had brought it) and was ready to complete the sale to Schaefer. It was well within Salazar's power (and grasp) to pass it to Schaefer had Schaefer come back with the funds and asked for actual delivery—and Salazar certainly intended to complete the sale. Our case law requires no more (see *Gutierrez*, 978 F.2d at 1469–70; and see the jury instruction we approved as "fairly and adequately stat[ing] the law of constructive possession" in *United States v. Saunders*, 973 F.2d 1354, 1361 (7th Cir. 1992)—the substantive equivalent of the instruction that the district judge gave here).

### Attribution of 15 Kilograms of Cocaine to Salazar

 Finally Salazar urges that the district court erred at sentencing in ascribing 15 kilograms of cocaine to him. Instead he asserts that the district court should have charged him with 5 kilograms at most—the same quantity ascribed to codefendant Jaramillo at his sentencing. Salazar's main contention in that respect is that all the talk about larger quantities was just puffing—that he was incapable of producing 15 kilograms of cocaine, as shown by the fits and starts that preceded the ultimate delivery of even a single kilo. As always in reviewing sentencing decisions, we apply a clearly erroneous standard to the district court's resolution of that issue (*United States v. Hoffman*, 957 F.2d 296, 300 (7th Cir.1992)).

Guidelines § 2D1.4(a) takes the sensible approach that where a defendant is apprehended before the conspiracy has run its course to a successful conclusion (the usual

scenario in a narcotics case where the conspirators are unwittingly dealing with undercover agents), the offense level tracks what would have been applicable to that defendant had the conspiracy achieved its objective. For that purpose the court is directed to look to the weight of narcotics then under negotiation (*id.* Application Note ("Note") 1), but is not to take note of any amount that defendant did not intend to produce and was not reasonably capable of producing (*id.*). Like other courts of appeal, we have affirmed district courts that have been faithful to those directives (see, e.g., *United States v. Buggs*, 904 F.2d 1070, 1078–79 (7th Cir.1990) and cases cited there).

■ Here the district judge was well within the bounds of reason in taking Salazar at his word as to his ability to deliver the goods. After Schaefer had told Jaramillo that he was looking for a supplier of 10 to 15 kilos of cocaine weekly, Salazar and Jaramillo agreed to generate such quantities. Not long thereafter Salazar told Schaefer in a telephone conversation that they had all the "pictures" (kilograms of cocaine) ready for Schaefer to pick up at any time. When Schaefer asked how many pictures were ready, Salazar said that 15 were ready right then.

Though there was a hitch in that delivery, the conversations between Salazar and Schaefer continued in the same vein as to Salazar's willingness to provide substantial quantities—15 kilograms or more—in the immediate future. And Salazar's ability to deliver as advertised is further buttressed by the high level of purity (97% pure) of the kilogram seized at the time of arrest— uncut cocaine likely to have come directly from a manufacturing source (something further supported by the nature of the packaging), and in turn supporting the inference of the likelihood of Salazar's access (through Jaramillo) to large quantities (see Guidelines § 2D1.1 Note 9 and *United States v. Lopez*, 937 F.2d 716, 726 (2d Cir. 1991)).

All of that provides an ample backdrop for a reasonable finding that Salazar's assurances as to his ability to deliver signifi-

cant quantities of cocaine were real and not mere puffery. But given the sensitivity of the Guidelines offense levels to specific quantities of drugs (see the Drug Quantity Table at Guidelines § 2D1.1(c)), it is also necessary to identify a rational basis for the express amount that was found by the district judge: 15 kilograms. That rests in part on the already-described references to that quantity in Salazar's discussions with Schaefer. And it is really nailed down by the confirmation from Jaramillo (who became cooperative with the government after his arrest) that Salazar had solicited his assistance in obtaining 15 kilograms and that Jaramillo and Salazar went to Chicago fully expecting to obtain three loads of 5 kilograms each.

Having said all this, however, we are constrained to note what must be viewed as a highly problematic use and application of the Guidelines that is reflected by the record and is raised in part by Salazar's objection—not in the rational attribution of 15 kilograms of cocaine to him, but rather in the simultaneous attribution of only 5 kilos to co-defendant Jaramillo. Even though that major differential serves as a partial springboard for the arguments that have been made before us on Salazar's behalf, the government's brief is entirely silent on the subject, and we have had to search the record for any potential justification of such a difference in treatment. Although Salazar ultimately cannot complain (either under equal protection doctrine or under any other legally cognizable principles) because Jaramillo may have been treated more leniently than *he* should have been— so long, that is, as Salazar himself was sentenced in accordance with the Guidelines—no arguably rational basis appears to justify that disparity in attribution.

Judicial criticism of the Guidelines and what they have done to the sentencing process (and there is much of it) is invariably met by reminders that the Guidelines are intended to eliminate (or at least to minimize) disparities in the treatment of defendants who have committed like offenses and have like criminal records. In the rationale that underpins the Guidelines,

any individual differences between the sentences imposed on such comparable crimefeasors are supposed to be a function of the court's right to impose different sentences within the range marked out by the Guidelines or to identify and utilize grounds for departure that are permissible under Guidelines law.

Whatever validity any such system may possess is seriously impaired by any practice that attributes different quantities of drugs—and hence creates different Guidelines ranges—for defendants who occupy identical positions in a drug deal. If for Guidelines purposes Salazar was indeed reasonably responsible for the 15 kilograms that were under negotiation with Schaefer for future delivery (and we have found that he was), and if that attribution is supported by the express admission of Jaramillo that the two of them (Salazar and Jaramillo) contemplated three deliveries of 5 kilos each and that they were capable of doing so through drug sources located via Jaramillo, there is no conceivable justification—remembering that Jaramillo was Salazar's *source* of the drugs—for ascribing 5 rather than 15 kilos of cocaine to Jaramillo.

Our review of the record, necessitated by the government's silence in its responsive brief, discloses this excerpt from the Government's Position with Respect to Sentencing Factors that it filed with the district court before sentencing:

4. The kilogram of cocaine delivered by Salazar and Jaramillo was in the original packaging and was 97% pure, which is an exceptionally high purity, obviously uncut. Uncut kilograms of cocaine in the original packaging are generally only distributed by persons close to an original importer into this country. Anyone who can distribute one kilogram of 97% cocaine in its original packaging has access to and can deliver far more than one, five, or fifteen kilogram quantities of cocaine. That goes for Jaramillo as well as Salazar.

5. The question with Jaramillo at his sentencing was not whether the government's evidence would support a finding that Jaramillo and his sources *could* deliver more than five kilograms of cocaine, but rather whether Jaramillo and Salazar *agreed* between themselves to actually deliver 15 kilograms, whether in one delivery or several, and as a necessary part of that whether they *believed* they could obtain 15 kilograms. Without the benefit of Jaramillo's immunized statements, the government viewed that as a very close question which, being that close, should be resolved in Jaramillo's favor due to his acceptance of personal responsibility through his guilty plea and his cooperation with the government, including his willingness to testify against Salazar.

But that approach, which puts into play at the Guidelines-determining stage the kind of factors that should properly come under consideration only when the court—having once determined the range—decides how to deal with the defendant within the range (or by departing from the range), mixes apples and oranges.

In applying the Guidelines, neither prosecutors nor judges are free to engage in the equivalent of the practice of "swallowing the gun" that is familiar to those who carry on plea bargaining in the state criminal practice—that is, pleading down (say) from an actual or potential charge of armed robbery to the lesser crime of robbery by ignoring defendant's use of a gun, all in exchange for a guilty plea to that lesser charge. We make no comment, of course, on the propriety of a prosecutor's reaching a Fed.R.Crim.P. 11(e)(1)(C) plea agreement with a defendant such as Jaramillo for a departure downward based on his cooperation, or on the propriety of a sentencing judge's granting such a departure on the government's motion—but the starting point for any such departure, the establishment of the Guidelines range, must not itself flout the concepts that inform the Guidelines.

In terms of the quantities of drugs that are chargeable to a criminal defendant, including the related concept of "relevant conduct under Guidelines § 1B1.3(a), the Guidelines have enacted a regime of "real offense" sentencing. Any examination of

the Guidelines system to see whether or not it is working, or whether it should be retained or changed and in what respects— to say nothing, for example, of the need to evaluate any departures from the Guidelines range to see if they are justified— must depend on the straightforward and uniform application of that system. That goal is defeated in this case by the government's having successfully advanced a major disparity in the quantity of cocaine attributed to Jaramillo, although for present purposes Salazar cannot complain about that disparity under the law.

In sum, there is no predicate for charging the district court with error—let alone clear error—in ascribing 15 kilograms of cocaine to Salazar for Guidelines purposes, even though the disparate Guidelines treatment of codefendant Jaramillo was troublesome for the reasons just outlined. Because the sentence imposed on Salazar was in the middle of the Guidelines range as it was permissibly calculated, the sentence must be upheld.

### Conclusion

We have considered all the challenges raised by Salazar, and we conclude that they provide no basis for reversal. Both Salazar's conviction and his sentence are AFFIRMED.