In the

# United States Court of Appeals
### For the Seventh Circuit

_____

Nos. 07-1336 and 07-1411

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TIMOTHY CLARK and GERARDO
VALTIERRA,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 06 CR 126—**Barbara B. Crabb**, *Chief Judge.*

_____

ARGUED MAY 16, 2008—DECIDED JULY 23, 2008

_____

Before BAUER, POSNER and WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.* During 2005 and early 2006, Defendants-Appellants Gerardo Valtierra and Timothy Clark were members of a cocaine distribution network that sold crack and powder cocaine in Illinois and Wisconsin. On June 12, 2006, Clark, Valtierra, and three other individuals were indicted for conspiracy to distribute cocaine in violation of 21 U.S.C. § 846. Clark was also charged with possession of cocaine with the intent to

distribute in violation of 21 U.S.C. § 841(a)(1).[1] A jury returned guilty verdicts on all counts.

On appeal, Valtierra argues that he was deprived of the presumption of innocence when the government argued in closing that his defense was merely the "standard defense" made by defendants in drug cases. Clark asserts that the district court erred in making various evidentiary rulings. For the reasons contained herein, we affirm the district court's rulings.

## I. BACKGROUND

Valtierra was the Chicago source of cocaine for the distribution network. He sold cocaine in bulk to Lawrence Green of Chicago, who then sold to Glenn Murphy of Milwaukee and Clark's son, Quincy, of Madison. Clark and his girlfriend, Amy Hill, served as couriers of the drugs and money between Green, Murphy, and Quincy. Clark and Hill also transported drugs from Chicago to Madison on occasion, for one Gregory Bennett.

Clark, Green and Bennett were all from the Englewood neighborhood in Chicago and were members of the Englewood Gangster Disciples. Clark bought drugs from Green back in 1997 and 1998, during which time Clark had encouraged Quincy (then thirteen years old) to start selling drugs.[2]

---

[1] A superceding indictment was returned on October 5, 2006, but did not fundamentally alter the charges against Clark or Valtierra.

[2] Quincy testified at trial that at thirteen or fourteen years of age, he was selling crack cocaine with his father and made approximately $3,500 per week doing so.

Clark was incarcerated from sometime in 1999 until November 2005. Hill met Clark in August 2005 when Clark was still incarcerated in Illinois. Around that same time, Green met Hill and began channeling money through her to Clark in prison.

Shortly after Clark was released from prison, Green visited him in Madison, Wisconsin, and Clark started transporting cocaine for him. Green also convinced Clark to let Hill transport the drugs to Wisconsin. Clark and Hill transported kilograms of cocaine from Green in Chicago to Murphy in Milwaukee. They also delivered crack cocaine from Green to Quincy in Madison, as well as an occasional transport for Bennett. Clark and Hill brought the drug proceeds back to Green.

On January 8, 2006, Clark was arrested for an Illinois parole violation, but even after his arrest and re-incarceration, Hill continued to transport the drugs and proceeds between Chicago, Milwaukee, and Madison; she also began to occasionally pick up cocaine from, and deliver money to Green's source, Valtierra.

On January 27, 2006, Quincy was arrested at a Burger King restaurant in Madison, when he met with an undercover detective and sold him the crack cocaine. Quincy agreed to cooperate with the government; he called Hill and ordered a delivery of crack cocaine. Hill obtained 180 grams of crack cocaine from Green, who had received the drugs from Valtierra. That same day, Hill met with Bennett and Kelly in Chicago, where she received eighty grams of crack cocaine, four hundred ecstacy pills, and 872 grams of marijuana for transport to

Madison.[3] Hill drove to Madison that day with all of the drugs and went to an Arby's restaurant, where she was supposed to meet Quincy. Instead, she was greeted by law enforcement; the drugs were found in her van and she agreed to cooperate with the police.

On January 31, 2006, Hill wore a recording device and met with Green in Chicago. The agents provided Hill with $5,000 in Drug Enforcement Agency (DEA) funds to pay Green for the 180 grams of crack cocaine she was supposed to deliver to Quincy. Hill called Green and he picked her up at the Greyhound Bus station in Chicago. After Hill gave Green the money, he told her to drive his black Hummer to his cousin's house in Englewood. Hill did so; the agents did not follow her into Englewood because of pervasive counter-surveillance in the neighborhood.

At Green's cousin's house, Hill was met by Bennett and Kelly, for whom she had transported drugs the previous week. Since the drugs were seized when Hill was arrested and because the agents had not anticipated Hill meeting Bennett and Kelly, Hill did not have money to pay for the drugs. Green's cousin drove off in the black Hummer, leaving Hill at the house with Bennett and Kelly. Angry about the missing drugs, Bennett and Kelly attacked Hill and discovered (and apparently destroyed) the recording device. Several hours later, they released Hill and she was found by law enforcement, who then took her to the emergency room at Holy Cross Hospital.

Meanwhile, Clark was trying to reach Hill from prison. Clark's phone calls were recorded. When Clark could not

---

[3] Bennett and Kelly planned to meet Hill in Madison and retrieve the drugs upon their arrival.

reach Hill, he called Green, who told him that Hill was "up here with the feds." Clark expressed disbelief, and Green told him that someone had "picked a wire off her" and that she was "workin' for 'em." Clark then tried to call his son, Quincy, but could not reach him. Clark eventually called Hill at the hospital. The conversation revealed that Clark had pieced together (mainly through conversations with his brother, Don) that Quincy was arrested and was cooperating against Hill, and that Bennett and Kelly had beaten up Hill. Knowing that Hill had worn a wire to the meeting with Green that day, Clark told her "I hope you ain't do something stupid."

Green, knowing that he had been recorded when he was with Hill (but apparently not knowing that the recordings had been destroyed), also agreed to cooperate with the police. On April 4, 2006, Green, acting as a police informant, introduced Valtierra to undercover Chicago Police Officer Eric Cato as a potential cocaine customer from Minneapolis. Valtierra agreed to sell kilograms of cocaine to Officer Cato and to provide the drugs on credit once they developed a relationship of trust, which was the same arrangement he had with Green. Valtierra mentioned that when Green owed him a substantial drug debt, Valtierra took his Hummer until Green repaid the debt. That same day, Valtierra delivered a pound of marijuana and two kilograms of cocaine to Officer Cato for Green on credit.

On April 10, 2006, Green called Valtierra and told him he was coming over to pay his cocaine debt. Carrying a money counter, Valtierra met Green at the back door of his house. Law enforcement agents accompanying Green searched Valtierra's house pursuant to a search warrant and found twenty-nine kilograms of cocaine and several

used kilo cocaine wrappers. After his arrest, Valtierra confessed that he had distributed multiple kilograms of cocaine. He told the agents that he received fifty kilogram shipments at a time and that he had distributed six kilograms of cocaine every week to Green for three months.

On June 12, 2006, Valtierra, Green, Clark, Bennett, and Kelly were indicted in Madison, Wisconsin, for conspiracy to distribute cocaine, as well as for other substantive drug charges. Green and Kelly pleaded guilty; Bennett disappeared and has not been found.

Valtierra and Clark were tried by jury on November 6, 2006. Fifteen witnesses testified for the government, including Officer Cato, Green, Quincy, and Hill.

Clark's defense, referred to by his counsel as the "patsy defense," was that Green, Hill, and Quincy conspired to set up Clark "as the insurance valve in case they got busted." Valtierra's trial strategy was that he and Green had a simple buyer-seller relationship. Valtierra testified that, as a cocaine wholesaler, he sold multiple kilograms of cocaine at a time for cash (not on credit), but had no idea what his customers did with the drugs or where the drugs ended up after he sold them to his customers.

At trial, Clark attempted to introduce part of Hill's written statement made to the government that Green had asked her to pose as a stripper to lure a man out of his house so that Green could confront him about a debt the man owed. After Green denied that the incident ever occurred, the district court did not allow the evidence to be heard, stating that the evidence would not make any fact or consequence more or less probable and was therefore irrelevant. Clark also attempted to introduce a

picture of Hill flashing what he claimed was a Gangster Disciples gang sign to impeach Hill's testimony that she was not a member of the gang and that she did not flash gang signs. The government objected to the picture, saying it was irrelevant to the charges against Clark, and that if the district court allowed Clark to introduce the picture, the government would have an officer testify that the sign flashed by Hill was actually a sign of disrespect to the Gangster Disciples. The court ruled that the picture could not come in during Hill's testimony, but that the issue could be revisited if Clark testified. Clark chose not to testify, and the picture was not admitted into evidence. The trial ended on November 14, 2006, with guilty verdicts on all counts.

On February 2, 2007, the district court sentenced Clark to two concurrent thirty-year prison terms and ten years of supervised release. On February 16, 2007, the district court sentenced Valtierra to 324 months' imprisonment and five years supervised release. Both Clark and Valtierra filed timely notices of appeal.

## II. DISCUSSION

On appeal, Clark argues that the district court erred: (1) in admitting evidence relating to his drug dealing and drug relationships with Quincy and Green prior to his 1999 incarceration; (2) in admitting evidence of the beating of Hill by Bennett and Kelly; (3) in excluding a picture of Hill flashing a gang sign; and (4) in excluding evidence of an incident in which Green asked Hill to pose as a stripper to get someone to pay a drug debt. Valtierra raises a single argument: that he was deprived of a fair trial by the prosecutor's remarks in closing argument that his

defense was "standard" for drug defendants. We address each argument in turn.

### A.  Clark's Prior Drug Relationships

On appeal, Clark asserts that evidence relating to his prior drug dealings and drug relationships with Quincy and Green violated Federal Rule of Evidence 404(b) and was not intricately related to the charges against him. Prior to trial, the government submitted that the evidence was admissible under Federal Rule of Evidence 404(b) to show Clark's "intent, knowledge, lack of mistake, motive and opportunity." To the surprise of the district court judge, defense counsel agreed to the admission of the evidence and expressed his intent to expand on it and offer even more evidence of other events to establish the "patsy defense," specifically, to show that the money Green channeled to Clark in prison was "hush money" to keep Clark quiet about Green's drug dealings and an alleged murder. At trial, however, defense counsel objected to the admission of the evidence, claiming that it was irrelevant, prejudicial, confusing, and cumulative. The government asserts that Clark has waived this argument, and we agree.

"Waiver occurs when a criminal defendant intentionally relinquishes a known right." *United States v. Clements*, 522 F.3d 790, 793 (7th Cir. 2008) (quoting *United States v. Brodie*, 507 F.3d 527, 530 (7th Cir. 2007)). Forfeiture, on the other hand, "occurs when a defendant negligently fails to assert a right in a timely fashion." *Id.* Waiver extinguishes any error and precludes appellate review, while forfeiture warrants review for plain error only. *Id.*; *see United States v. Haddad*, 462 F.3d 783, 793 (7th Cir. 2006).

When a defendant elects to pursue one argument over another as a matter of strategy, he waives those arguments he decided not to present. *United States v. Jaimes-Jaimes*, 406 F.3d 845, 848 (7th Cir. 2005) (citing cases).

Rarely is there a clearer example of waiver than exists here. Clark affirmatively and repeatedly agreed to the admissibility of the evidence establishing his prior drug dealing and drug relationships, and made clear to the district court that he wished to expand on that evidence to establish his "patsy defense." Clark's intent to forego his current argument against the evidence is clear in the record. At no point prior to this appeal did Clark object to the evidence as not intricately related; in fact, his defense strategy depended on the evidence being intricately related to the facts and circumstances of the current charges in order to show that the prior relationship and channeling of funds from Green was evidence that Clark was merely the insurance valve for the conspiracy. *See United States v. Simpson*, 479 F.3d 492, 500 (7th Cir. 2007) (explaining the "intricately related evidence" doctrine). His defense strategy failed, but that does not entitle the issue to appellate review. Clark waived the argument that evidence of his prior drug relationships was improperly admitted.

### B.   The Attack on Amy Hill

Next, Clark argues that the district court erred in allowing the government to present evidence of the beating of Hill by Bennett and Kelly. Clark argues that the evidence is irrelevant, and that despite the district court's (and the prosecutor's) repeated statements to the jury that neither Clark nor Valtierra were involved in the beating, the

evidence unfairly prejudiced him. The government contends that the evidence was properly limited to provide context to the recordings of Clark's telephone calls from prison that related to the beatings and discussed various co-conspirators and the chain of events resulting in their arrests. At one point during Hill's testimony, it was revealed that Bennett and Kelly had ground cigarettes out on her. Clark objected and moved for a mistrial, claiming the evidence was inflammatory and prejudicial. The district court denied the motion.

We review the district court's evidentiary rulings for an abuse of discretion. *See United States v. Samuels*, 521 F.3d 804, 813 (7th Cir. 2008). We accord great deference to the district court judge's determination, and we will second-guess that judgment only in extreme cases. *Id.*; *see United States v. Strong*, 485 F.3d 985, 991 (7th Cir. 2007).

The district court did not err in admitting the evidence of the attack on Hill or in denying Clark's mistrial motion. The district court and the government went to great lengths to limit the evidence of the attack on Hill to only that which was needed to provide context for the recorded conversations between Clark and other co-conspirators. Context for those conversations was necessary because the recordings illustrated Clark's drug relationships with Green, Hill, and Quincy, and to rebut his "patsy defense" that he was oblivious to the cocaine distribution network. Accordingly, the entire phone conversations discussing the attack on Hill were properly admitted, and the appropriate limiting instruction was given. *See United States v. Burton*, 937 F.2d 324, 327-28 (7th Cir. 1991). Although there may be a question as to one detail of the attack (that Hill was burned with cigarette butts), Clark's trial counsel, the prosecutor, and

the district court judge repeatedly admonished the jurors that the evidence of Hill's beating was to be used solely to put Clark's statements in context and that Clark was in no way responsible for the attack. As such, we cannot conclude that Clark was prejudiced by the evidence of the attack, thus any potential error resulting from the jury hearing about the cigarette burns was harmless. *See* Fed.R.Crim.P. 52(a); *United States v. Lee*, 502 F.3d 691, 696 (7th Cir. 2007) (noting that even if the district court erred in admitting evidence, we will not reverse if the error was harmless).

### C. The Picture of Hill Making Hand Gestures

Clark asserts that the district court judge erred when she refused to allow him to admit a picture of Hill making a hand gesture, which he stated was a gang sign for the Gangster Disciples. Clark attempted to use the picture during cross-examination of Hill to impeach her, since she had testified that she was not a member of the Gangster Disciples and that she never flashed gang signs, and to establish that Hill and Green had a pre-existing drug relationship. The government contested admission of the picture, saying Hill's gesture was actually one of disrespect to the Gangster Disciples and would only confuse the jury. The government also asserted that the picture did nothing to prove a pre-existing drug relationship, plus Hill and Green had already testified to having met prior to Clark's release from prison in 2005. The district court judge stated that the picture could not come in through Hill, but that Clark could revisit it if he testified, since defense counsel insisted that Clark could lay the proper foundation and would testify that the gesture Hill made in the picture was in fact a

Gangster Disciple signal. Based on this, the district court judge deferred admission of the photograph until Clark laid the proper foundation for the picture's admission; Clark elected not to testify, thus the district court never made a final ruling on the issue.

When a district court indicates that a final evidentiary ruling must await developments at trial, the party must re-offer the evidence at trial to preserve the issue for appeal. *Mathis v. Phillips Chevrolet, Inc.*, 269 F.3d 771, 775 (7th Cir. 2001). Where the party fails to revisit and offer the evidence at trial and the evidentiary issue is left unresolved, we review only for plain error, and we will not disturb the district court's ruling unless the error is "clear or obvious" and "affects [the defendant's] substantial rights." *United States v. Alden*, 527 F.3d 653, 662 (7th Cir. 2008) (quoting *United States v. Schalk*, 515 F.3d 768, 776 (7th Cir. 2008)). There was no plain error here.

### D.  Green's Request for Hill to Pose as Stripper

Clark's final argument on appeal is that the district court improperly excluded Hill's statement that, prior to Clark's release from prison in 2005, Green had asked her to pose as a stripper to get someone to pay a drug debt. Clark attempted to introduce Hill's statement on cross-examination of Green after he denied having made that request, to show that Hill and Green had conspired together without Clark. The government objected, claiming that the entire incident was irrelevant to the crimes charged, and pointed out that it was undisputed that Green and Hill met before Clark was released from prison, and that they continued to have a drug relationship after Clark was imprisoned again in early 2006. The

district court sustained the government's objection and excluded evidence of the alleged incident.

Because the incident made no fact of consequence more or less probable and did not lend support to Clark's "patsy defense," the district court did not abuse its discretion in excluding the evidence. *See* Fed.R.Evid. 401 (Evidence is relevant if it has "any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence."); *Lee*, 502 F.3d at 696 (same). Both Hill and Green testified that they had met prior to Clark's release in 2005, and that their drug relationship continued after his re-incarceration in January 2006. It was therefore undisputed that Green and Hill engaged in a large-scale cocaine distribution scheme when Clark was absent. Accordingly, the evidence of the incident had no probative force and was properly excluded.

### E. Prosecutor's Categorization of Valtierra's Defense as "Standard"

Valtierra's sole argument on appeal is that the government's closing argument improperly categorized his anticipated closing argument as a "standard" argument made by defendants in drug cases, and that this improper categorization deprived him of the presumption of innocence. Because Valtierra objected to the prosecutor's remarks at trial, we review the district court's decision to overrule his objection for an abuse of discretion. *Simpson*, 479 F.3d at 503.

Where a defendant asserts that the prosecutor's closing argument was improper, we analyze the conduct under

the framework of "prosecutorial misconduct." *See Simpson*, 479 F.3d at 503 (citing *United States v. Bowman*, 353 F.3d 546, 550 (7th Cir. 2003)). We first address the alleged misconduct to determine if it was in fact improper. *United States v. Corley*, 519 F.3d 716, 727 (7th Cir. 2008); *United States v. Morris*, 498 F.3d 634, 638 (7th Cir. 2007). If it was improper, we next consider whether it prejudiced the defendant. *Corley*, 519 F.3d at 727 (citing *United States v. Serfling*, 504 F.3d 672, 677 (7th Cir. 2007)).

In *Taylor v. Kentucky*, 436 U.S. 478 (1978), the Supreme Court found that a prosecutor's closing argument was improper where it analogized the defendant's presumption of innocence to "every other defendant who's ever been tried who's in the penitentiary or in the reformatory today," and described the defendant's conduct after the alleged crime as the same conduct of defendants who commit that type of offense. *See* 436 U.S. at 486-87. The Court noted that statements like these in closing argument imply that "all defendants are guilty and invite[ ] the jury to consider that proposition in determining [the defendant's] guilt or innocence." *Id.*

Although the prosecutor did not equate the defendant's argument with other defendants who had been convicted and incarcerated for a similar offense, the underlying intent of the statement was to do as much. The fact that other drug conspiracy defendants have made the same argument in their defense (that they had a buyer-seller relationship, not a conspiratorial agreement) is irrelevant to the defendant's guilt or innocence and thus is an improper argument. "[O]ne accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion . . . or other

circumstances not adduced as proof at trial." *Taylor*, 436 U.S. at 485 (citing *Estelle v. Williams*, 425 U.S. 501 (1976)). The prosecutor's classification of Valtierra's anticipated defense as the "standard argument" for drug defendants sought to persuade the jury of Valtierra's guilt on a third-party propensity-style argument: because other defendants had argued this before Valtierra, Valtierra's defense must not be sincere. We conclude that the categorization of Valtierra's anticipated defense was improper.

So we turn to the question of prejudice. In determining prejudice, we consider the following factors: (1) whether the prosecutor misstated the evidence; (2) whether the remark implicated a specific right; (3) whether the defendant invited the remark; (4) whether the district court provided (and the efficacy of) a curative instruction; (5) whether the defendant had an opportunity to rebut the remark; and (6) the weight of the evidence against the defendant. *Corley*, 519 F.3d at 727. "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Washington*, 417 F.3d 780, 786 (7th Cir. 2005) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation omitted)). We note, however, that improper statements made during closing argument are rarely reversible error. *United States v. Anderson*, 450 F.3d 294, 300 (7th Cir. 2006); *United States v. Amerson*, 185 F.3d 676, 685-86 (7th Cir. 1999); *see also Taylor*, 436 U.S. at 487 n.14 (noting that prosecutor's improper statement linking defendant to every other defendant who turned out to be guilty, standing alone, would not necessarily rise to the level of reversible error).

An examination of these factors and of the record as a whole leads us to conclude that Valtierra was not prejudiced by the prosecutor's improper remarks. The prosecutor did not misstate the evidence presented at trial. Other than a few references to the term "standard" to describe Valtierra's anticipated defense, the prosecutor's closing argument accurately reiterated the overwhelming evidence of Valtierra's guilt. Valtierra had agreed to sell kilograms of cocaine to Officer Cato and to provide the drugs on credit once they established a relationship of trust. At that same meeting, Valtierra told Officer Cato about Green's drug debt to him, and said that he had taken Green's Hummer as collateral. That same day, Valtierra gave Officer Cato a pound of marijuana and two kilograms of cocaine for Green on credit. A search of Valtierra's house (which was arranged by Green claiming to come over to pay his drug debt) yielded twenty-nine kilograms of cocaine and several used kilo cocaine wrappers. After his arrest, Valtierra admitted to distributing multiple kilograms of cocaine, receiving fifty kilogram shipments at a time, and distributing six kilograms of cocaine per week for three months to Green.

Although Valtierra did not invite the remark, he did have the opportunity in his closing argument to rebut it. Furthermore, the district court instructed the jury that the government had the burden of proving Valtierra guilty beyond a reasonable doubt, and that the attorneys' arguments and statements were not to be considered evidence. The remark was not so powerful or overwhelming to make it impossible for the jury to disregard it, and so we presume that the jurors followed the instructions from the court. *See United States v. Danford*, 435 F.3d 682, 687 (7th Cir. 2006) (noting that jurors are presumed to

be capable of disregarding improper evidence presented to them unless the evidence is so incriminating that they could not be expected to put it out of their minds). In light of the overwhelming evidence of Valtierra's guilt, we find that the prosecutor's improper categorization of Valtierra's anticipated defense did not prejudice Valtierra.

### III.  CONCLUSION

For the reasons stated herein, the convictions of Clark and Valtierra are AFFIRMED.