In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2121

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERTO REBOLLEDO-DELGADILLO,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13-cr-00673 — **John J. Tharp, Jr.**, *Judge.*

ARGUED APRIL 6, 2016 — DECIDED APRIL 28, 2016

Before FLAUM, RIPPLE, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge.* Defendant Roberto Rebolledo-Delgadillo ("Rebolledo") appeals his conviction of possession with intent to distribute more than five kilograms of cocaine under 21 U.S.C. § 841(a)(1). Rebolledo, who attempted to broker a large cocaine deal, argues that there was insufficient evidence to support his conviction. He also contends that he is entitled to a new trial because the government presented false testimony and misled the jury during closing arguments, as

well as a new sentencing because the district court improperly denied safety valve relief. We affirm his conviction and his sentence.

## I. Background[1]

In early August 2013, Rebolledo contacted a man he thought was a potential cocaine buyer, but who turned out to be a confidential informant employed by the Drug Enforcement Administration ("DEA") (we refer to him as the "CI"). When Rebolledo suggested a drug sale, the CI contacted the DEA.

Rebolledo and the CI planned the transaction during three meetings that took place at the CI's horse ranch in south Chicago. Rebolledo offered to connect the CI with a drug supplier and the CI agreed to purchase over $200,000 of cocaine. The parties arranged for the transaction to take place at the CI's ranch on August 16, 2013.

On that day, the drug supplier, Juan Ramirez-Gutierrez ("Ramirez"), dropped Rebolledo off at the ranch. Ramirez then left to pick up the drugs and Rebolledo and the CI waited behind. The CI wore a recording device with a three-hour recording capacity, but for unknown reasons, the device only recorded the first hour of the meeting. The recording device had likewise failed during other pre-deal meetings between the CI and Rebolledo.

---

[1] These facts were taken from trial testimony by the confidential informant and co-defendant Mario Orozco-Aceves. Rebolledo did not testify at trial and offered a different version of the facts during his safety valve proffer with the government, as we discuss later.

Ramirez returned to the ranch with co-defendant Mario Orozco-Aceves ("Orozco"). Rebolledo approached the car and Ramirez told Rebolledo that Orozco was the person who would "deliver the work to [Rebolledo]." Ramirez and Orozco then left to pick up the drugs. Shortly thereafter, Orozco returned by himself. It is unclear from the record whether Rebolledo let Orozco onto the property and told him where to park, or whether Orozco entered the property without any instruction from Rebolledo.[2]

After Orozco parked his car, he took a duffle bag containing cocaine out of the trunk and brought it into a small bathroom at the ranch. According to Orozco, Rebolledo followed him into the bathroom and asked Orozco to leave the drugs in a specific location on the bathroom floor. Orozco complied. The CI, who was standing in the doorway of the bathroom, gave a similar account of the events. However, the CI did not indicate whether Rebolledo directed Orozco to put the drugs on the floor, or whether Orozco did so of his own volition.

Orozco then opened the bag to show the CI that it contained cocaine. After seeing the drugs, the CI left Rebolledo and Orozco alone in the bathroom for about two minutes. Orozco testified that he asked Rebolledo "where he wanted the drugs because I was not going to leave them in my duffle bag because I told him that that bag was my personal bag." Rebolledo responded that he would ask the CI where to put the drugs, and Rebolledo and Orozco exited the bathroom together. Minutes later, police officers arrested Rebolledo and

---

[2] Orozco testified that Rebolledo directed him where to park, but the CI testified that Rebolledo remained in the barn while Orozco drove onto the property.

Orozco. The officers found six kilograms of cocaine in the bag in the bathroom. Rebolledo did not touch the bag or the drugs at any point.

On September 12, 2013, a grand jury indicted Rebolledo for possession with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1). During the three-day trial, the government introduced testimony from the CI; Orozco (who was also charged in the indictment); the DEA case agent, Special Agent David Brazao; and another DEA agent. On July 23, 2014, the jury returned a guilty verdict.

Before sentencing, Rebolledo requested and participated in a proffer with the government for purposes of obtaining safety valve relief. On May 20, 2015, the district court held a sentencing hearing in which it denied safety valve relief and sentenced Rebolledo to 120 months in prison, the mandatory minimum sentence. The district court also denied Rebolledo's post-conviction motions. This appeal followed.

## II. Discussion

### A.  Sufficiency of the Evidence

Rebolledo first argues that the evidence submitted to the jury was insufficient to support his conviction for possession of a controlled substance under § 841(a)(1). When considering a sufficiency of the evidence claim, we "review the evidence in the light most favorable to the government and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Love*, 706 F.3d 832, 837 (7th Cir. 2013). "A conviction will not be overturned unless the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable

doubt." *United States v. Joshua*, 648 F.3d 547, 550 (7th Cir. 2011) (citation and internal quotation marks omitted).

The government argued at trial that Rebolledo constructively possessed the cocaine because he brokered the August 16 transaction. "Constructive possession is a legal fiction whereby an individual is deemed to possess contraband items even when he does not *actually* have immediate, physical control of the objects, i.e., the individual does not possess them in a literal sense." *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009) (citation and internal quotation marks omitted). Constructive possession requires proof that the defendant had the "power and intent" to exercise "ownership, dominion, authority, or control" over the contraband. *United States v. Campbell*, 534 F.3d 599, 606 (7th Cir. 2008); *see also United States v. Kitchen*, 57 F.3d 516, 523 (7th Cir. 1995) ("[T]he essential proof of possession that we require is *some factor* indicating that [the defendant] had the authority or the ability to exercise control over the contraband."). Accordingly, the government argued that Rebolledo constructively possessed the cocaine because he had the ability and intention to control it, as evidenced by his interactions with Orozco. The jury agreed.

Even after construing the evidence in the light most favorable to the government, Rebolledo's conviction hangs on a shred of evidence: Orozco's testimony that Rebolledo directed him to put the drugs in a specific spot in the bathroom. Nonetheless, that evidence is sufficient to support Rebolledo's conviction. The jury could have reasonably concluded that at that point, Orozco surrendered control over the cocaine to Rebolledo.

In arguing that this evidence is insufficient, Rebolledo contends that Orozco was not a credible witness. But at this

stage, we are not permitted to weigh the evidence or make credibility determinations, and we afford great deference to the jury's factual findings and credibility determinations. *See United States v. Williams*, 553 F.3d 1073, 1080 (7th Cir. 2009). Minor inconsistencies between Orozco's and the CI's testimony are not enough to show that the CI was incredible, and the jury was entitled to rely on Orozco's testimony in its entirety. *See United States v. Reed*, 875 F.2d 107, 111 (7th Cir. 1989) (observing that "[I]t is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences." (citation and internal quotation marks omitted)).

Rebolledo also contends that there was insufficient evidence for the jury to conclude that Orozco surrendered control of the drugs to Rebolledo. Rebolledo points out that Orozco announced that he would not leave the duffle bag and argues that this statement showed that Orozco retained control of the drugs. But Orozco's statement concerned the duffle bag—his personal property—and not the drugs inside. If anything, Orozco's statement suggests that Orozco had surrendered possession of the drugs to Rebolledo, otherwise, there would have been no reason for Orozco to announce that he wished to take the bag.

Somewhat inconsistently, Rebolledo argues that the CI was the one who controlled the drugs after Orozco placed them on the floor. To support this theory, Rebolledo notes that when Orozco asked him where to put the drugs, Rebolledo answered that they should ask the CI. But the fact that Rebolledo sought input from the CI on where to move the drugs does not undermine the conclusion that Rebolledo controlled and thus possessed the drugs. Rebolledo's job as broker was

to tender the drugs to the CI in exchange for payment. Until the money changed hands, there was no reason to think that the CI had a possessory right in the drugs. *See United States v. Manzella*, 791 F.2d 1263, 1266 (7th Cir. 1986) (observing that to establish possession, the defendant must have "ultimate control over the drugs" or the right "to possess them, as the owner of a safe deposit box has legal possession of the contents even though the bank has actual custody").

Rebolledo also contends that he could not have possessed the drugs because they belonged to Ramirez, the supplier. But Ramirez was not present at the ranch during the transaction—instead, Ramirez told Rebolledo that Orozco would deliver the drugs to Rebolledo. Therefore, the evidence is entirely consistent with the theory that Rebolledo was a stand-in for Ramirez during the transaction, with a corresponding right to control and possess the drugs.

Even assuming for the sake of argument that Rebolledo did not possess the drugs, the jury had a basis to convict Rebolledo because he aided and abetted Orozco's possession of the cocaine. *See* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."); *United States v. Ortega*, 44 F.3d 505, 507–08 (7th Cir. 1995) (affirming the defendant's conviction for aiding and abetting the possession of heroin, even where there was insufficient evidence that the defendant himself possessed it, because the defendant pointed to the drugs and informed the purchaser that they were "the best"). Although Rebolledo was not charged in the indictment with aiding and abetting, it is permissible to charge a defendant as a principal and convict

him as an aider and abettor.[3] *See United States v. Salazar*, 983 F.2d 778, 782 (7th Cir. 1993). As in *Salazar*, the evidence supports the necessary elements of aider and abettor liability: (1) Orozco initially possessed the cocaine and intended to distribute it; (2) Rebolledo encouraged and assisted Orozco in committing that offense; and (3) Rebolledo had the requisite intent to participate in the criminal activity with the goal of making it succeed. *See id*.

In sum, there is sufficient evidence to convict Rebolledo under either a constructive possession theory or an aiding and abetting theory.

### B.  False Trial Testimony

Rebolledo next contends that the government violated his due process rights when Special Agent Brazao gave false testimony at trial. We review this constitutional claim de novo. *United States v. Volpendesto*, 746 F.3d 273, 289 (7th Cir. 2014).

It is undisputed that Brazao testified inaccurately that the CI's recording device captured three hours of conversation on August 16, and that the recording provided in discovery was shortened to cut "social conversations" that were unrelated to the actual transaction. In reality, the recording device stopped recording after one hour for unknown reasons and failed to

---

[3] Although the government did not focus on an aiding and abetting theory at trial, it proposed an aiding and abetting jury instruction that the district court adopted with minor modifications. The district court's instruction read: "If you find that [Rebolledo] knowingly aided, counseled, commanded, or induced [Orozco] to commit the crime of possession with intent to distribute a controlled substance, [Rebolledo] may be found guilty of that offense if he knowingly participated in the criminal activity and tried to make it succeed."

record the drug delivery. On cross-examination, Brazao testified accurately that the recording only lasted for one hour and that the device was not recording when the drugs arrived at the ranch.

After the jury returned its guilty verdict, Rebolledo moved for a new trial based on Brazao's false testimony. The district court denied the motion, explaining that there was no basis to conclude that Brazao intentionally offered the inaccurate testimony. The court also noted that the defense was able to clear up any misunderstanding by cross-examining Brazao and providing transcripts of the recording to the jury.

We agree with the district court. To prove a violation of due process on the basis of false testimony, the defendant must show that: (1) the prosecution's case included perjured testimony; (2) the prosecution knew, or should have known, of the perjury; and (3) there is a likelihood that the false testimony could have affected the judgment of the jury. *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995). Rebolledo has not provided any evidence that Brazao intentionally offered the false testimony; instead, Brazao's inconsistent testimony suggests that he was confused about the length of the recording. Moreover, Rebolledo had an "adequate opportunity to expose the alleged perjury on cross-examination," undermining his claim that the jury relied on the false testimony. *Id*. Not only did the defense present excerpts from the recording transcript showing the length of the recording, the defense elicited factually correct testimony from Brazao on cross-examination. The CI also testified accurately that the device recorded for one hour, and stated that he did not stop the device from recording. Because Brazao's false statements were cleared up,

including by his own testimony on cross-examination, there is no basis to conclude that they affected the jury verdict.

Rebolledo also argues that the district court erred by refusing to allow a spoliation of evidence jury instruction, a claim we review for abuse of discretion. *Russell v. Nat'l R.R. Passenger Corp.*, 189 F.3d 590, 593 (7th Cir. 1999). Rebolledo's proposed instruction would have informed the jury that if it determined that the government had recorded the drug transaction, but destroyed parts of the recording in bad faith, the jury could assume that those destroyed portions were unfavorable to the government. But there was no evidence whatsoever that the government destroyed parts of the recording or tampered with the recording device. To the contrary, the CI testified that he did not stop the tape recorder. In addition, the device had stopped prematurely during previous meetings between the CI and Rebolledo, which suggests a recurring mechanical issue was to blame. The proposed instruction would only have confused the issue for the jury, and thus, the district court did not abuse its discretion in refusing to give it. *See United States v. Dana*, 457 F.2d 205, 209 (7th Cir. 1972).

## C.  Closing Argument

Rebolledo also contends that the government misstated the law during its closing argument by suggesting that knowledge of the drugs is sufficient to establish constructive possession. Similarly, Rebolledo contends that the government attempted to confuse the jury by arguing in closing that directing Orozco's car was sufficient to establish "direction" for purposes of constructive possession. "Where a defendant asserts that the prosecutor's closing argument was improper, we analyze the conduct under the framework of prosecutorial misconduct." *United States v. Clark*, 535 F.3d 571, 580 (7th Cir.

2008) (citation and internal quotation marks omitted). We first address the alleged misconduct to determine if it was in fact improper, and if it was, we consider whether the misconduct prejudiced the defendant. *Id.*

Rebolledo is incorrect that the government's closing argument suggested that something less than proof of direction or control of the drugs was necessary for possession.[4] Instead, the government's closing argument was entirely consistent with its argument throughout trial: that Rebolledo constructively possessed the cocaine because he directed and controlled Orozco. This argument was not improper. Tellingly, as the district court noted in its denial of Rebolledo's post-trial motions, Rebolledo never objected to the government's constructive possession argument at trial. As such, there is no basis to conclude that the government misstated the law or misled the jury during its closing argument.

---

[4] In closing, the government argued, in relevant part:

> The defendant commanded, controlled, basically, he told Orozco what to do with th[e] drugs. He knew the drugs were on the way, and when Orozco arrived in that little black Honda, it was the defendant who commanded him, controlled him, told him what to do with the drugs, told him everything, including where to park. Park your car there, bring the drugs in, put them in this room, and leave them for my customer, [the CI]. You put all of that together, and you know that the government has proven beyond a reasonable doubt that the defendant knowingly possessed a controlled substance.

### D.  Safety Valve Relief

After trial and before sentencing, Rebolledo requested a case agent interview with the goal of obtaining safety valve relief. Rebolledo was granted an interview, but the district court refused to grant safety valve relief because it found that Rebolledo's proffer was not complete and truthful. On appeal, Rebolledo argues that this conclusion was in error. We review the district court's factual findings concerning a defendant's eligibility for the safety valve for clear error. *United States v. Ramirez*, 94 F.3d 1095, 1099 (7th Cir. 1996).

The safety valve provision of 18 U.S.C. § 3553(f) permits a court to sentence certain first time, non-violent drug offenders, who were not organizers of the criminal activity and who make a good faith effort to cooperate with the government, to a sentence under the federal guidelines instead of the applicable statutory mandatory minimum sentence. *United States v. Montes*, 381 F.3d 631, 634 (7th Cir. 2004). A sentencing court "shall" apply the safety valve provision for any defendant who meets five criteria. *Id*. Only the fifth criterion is at issue in this appeal: whether "the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan … ." § 3553(f)(5). The defendant bears the burden of proving by a preponderance of the evidence his eligibility for safety valve relief. *See Ramirez*, 94 F.3d at 1101.

In Rebolledo's case agent interview, Rebolledo admitted to participating in the August 2013 transaction. He explained that he met the CI through a friend, "Individual P," who had hired Rebolledo to be his driver. He stated that a year and a half before the August 2013 drug deal, Individual P offered

him $100 for a ride to the CI's ranch. Rebolledo claimed that he was unaware that Individual P was visiting the ranch to plan a drug deal with the CI.

Rebolledo explained that he contacted the CI in August 2013 because his daughter had expressed interest in seeing horses. In addition, Rebolledo was in financial trouble and was looking for additional work with his catering business. Rebolledo refused to give the CI his real name and instead used his nickname, "Pelon."

According to Rebolledo, the CI told him that he was not interested in Rebolledo's catering business and offered him a different job—finding a large quantity of cocaine for the CI to buy. Rebolledo explained that although he had never dealt drugs before, he told the CI he would help him find a supplier. Rebolledo then approached a friend who put Rebolledo in touch with Ramirez. Rebolledo claimed that he had not met or spoken to Ramirez before then, and likewise claimed that he had not met Orozco before August 16. According to Rebolledo, it was not until Ramirez drove Rebolledo to the ranch that he learned that he would earn $350 per kilogram of cocaine sold to the CI.

After the interview, the government explained that it did not believe that a newcomer to the drug trade, without a reputation for trustworthiness, could broker a six-kilogram cocaine transaction. Rebolledo continued to deny that he had been involved in prior drug transactions. He suggested that Ramirez trusted him with the large transaction because Rebolledo had told Ramirez that he had seen the CI's buy money. Rebolledo also explained that the CI's ranch was famous in

the local Mexican community, and that it was the CI's reputation as a drug dealer and entertainer that encouraged Ramirez to go forward with the deal.

The district court denied safety valve relief because it was unpersuaded that Rebolledo spoke truthfully in his interview. The district court pointed to inconsistent and implausible statements, including that Rebolledo did not know that he was aiding in a drug deal when he drove Individual P to the ranch; the fact that Rebolledo used a pseudonym when he contacted the CI, "a practice that makes no sense at all for someone who is applying to be a cook"; and Rebolledo's assertion that he had never been a drug dealer before, yet it took no arm twisting or enticement to convince him to deal kilogram quantities of cocaine for the CI.

We share the district court's disbelief that an experienced drug dealer like Ramirez would allow a novice to broker a $200,000 drug transaction. Moreover, there is evidence in the record that casts doubt on several of Rebolledo's interview statements, including his claim that he had not been involved in previous drug transactions. For example, Rebolledo admitted to driving Individual P to the CI's ranch eighteen months before the August 16 transaction. As the district court observed, Individual P and the CI planned a drug deal during that meeting. It is difficult to accept Rebolledo's claim that he did not know about that drug deal given that Rebolledo contacted the CI eighteen months later, refused to give the CI his real name, and then became entangled in a large drug transaction. In light of that evidence and the other suspicious and inconsistent statements contained in Rebolledo's proffer, the district court did not clearly err in refusing safety valve relief.

### III. Conclusion

For the foregoing reasons, we AFFIRM Rebolledo's conviction and sentence.