In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 10-2140, 10-2181 & 10-2182

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WANDA JOSHUA, ANN MARIE KARRAS,
and DOZIER T. ALLEN, JR.,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
Nos. 2:07 CR 132 & 2:08 CR 41—**Philip P. Simon**, *Judge.*

ARGUED NOVEMBER 1, 2010—DECIDED AUGUST 8, 2011

Before ROVNER, WOOD, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* The Calumet Township Trustee's
Office ("Trustee's Office") is a political subdivision of
Indiana that provides various social services to citizens
of Gary and Griffith. Defendants Wanda Joshua, Ann
Marie Karras, and Dozier T. Allen, Jr., ran the Office.
Unfortunately, they did not do so honorably; instead,
they engaged in a scheme to defraud the Office by

taking substantial payments for work they did not perform. In particular, they commandeered checks made out to the Office by the Indiana Department of Workforce Development Services and, instead of using the funds for their intended purpose, they deposited them into their own personal bank accounts. This led to charges and convictions on two counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346. On appeal, the defendants raise three issues: first, that the evidence was insufficient on the mailing element of mail fraud, thereby requiring their acquittal; second, that the decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010), requires us to set aside their convictions; and finally, that the district court improperly instructed the jury regarding their advice-of-counsel defense. Although we find the evidence of mailing thin, we conclude that it was enough to send the case to the jury. As neither of the other two points has merit, we therefore affirm.

## I

The Trustee's Office in Calumet Township is responsible for providing help to residents facing economic difficulties. The Office offers a variety of services, including job training, employment assistance, and welfare payments. Allen was elected and served as Trustee; Joshua served as Allen's Deputy Trustee; and Karras served as Deputy Finance Trustee. In 1998, the United States Department of Labor began distributing grants for welfare-to-work programs in an effort to reform welfare programs around the country. As part of that effort, the

Department offered Indiana a $15 million grant. As a condition of the grant, Indiana had to demonstrate that a certain amount of non-federal funds were already being spent on programs aimed at helping people make the transition from welfare to gainful employment. The state realized that the funds distributed by the Trustee's Office would qualify as matching funds, and so it asked the Office to compile and report its financial data. In response, the Office entered into a contract in early 2000 with the Indiana Department of Workforce Development Services ("IDWDS") under which the latter would provide a monthly report of all non-federal dollars spent by the Office. In return, IDWDS was to pay the Office for "salaries, fringe, travel, and all other work-related expenses" in connection with that service. The contract stated that IDWDS would pay the Office no more than $50,000 for the first six months of the year 2000, and no more than $4,167 each month thereafter. The Office could obtain payment by submitting to IDWDS an invoice with supporting documentation of allowable costs.

It turned out that providing this information to IDWDS was a cinch for the Office. Winfo Data Systems, which serviced the Township's computer software needs, wrote a program that would process the data entered as part of the Office's regular operations and, in less than a minute, generate the desired financial report. Despite this development, the Office submitted invoices to IDWDS with each report in the maximum allowed amount of $4,167; despite the lack of any documentation of costs, IDWDS dutifully paid the invoices in full. Then,

instead of directing this money to the Office, the defendants pocketed the bounty themselves. Between November 2000 and December 2002, a little over $170,000 in IDWDS payments was deposited into a Fifth Third Bank account. These funds were then disbursed to the defendants as "administrative fees." Altogether, Allen received $28,000; Joshua received $51,000; and Karras received $38,000.

The defendants did nothing to earn these spoils. Tellingly, the budgets that the Office submitted to the Township Board never mentioned the IDWDS contract. Although the Office hired financial consultant James Bennett to prepare the budgets in consultation with Karras, Karras never saw fit to disclose the Fifth Third Bank account. When presenting the Office's annual finances to the Board, Allen furnished a lengthy written report that reflected the payments made to the defendants, but he did not draw anyone's attention to these substantial payments at the meeting. Nor did the defendants report these payments as they were required to do by Indiana Law. IND. CODE § 35-44-1-3.

Unfortunately for the defendants, the scheme unraveled before too long. One Board member, Roosevelt Allen, Jr. (Allen's second cousin, as it happens), was approached by a newspaper reporter inquiring about the IDWDS contract. (Like the government, we refer to him as "Roosevelt" to avoid confusion.) At the next Board meeting, Roosevelt raised the issue, asking whether Trustee Allen had the authority to pay himself from this particular program. The Office's attorney,

Frederick Work, expressed the opinion that the financial arrangement was appropriate. Work would later testify that he based his legal conclusion on Township Resolution No. 98-5a. This Resolution sought to obtain additional funds for the Office's public welfare programs. It stated that any such funds could be used to compensate the Trustee and his staff for their service and expenditures; it also called for proper financial reporting and auditing procedures. Work testified that he advised Dozier Allen that he could use these grant monies as he saw fit, without seeking Board appropriation. Work reasoned that since the work associated with these grant monies was off-budget, Allen, Joshua, and Karras could receive compensation beyond their budgeted salary. Work conceded, however, that if the defendants performed no work, they could not be paid.

It is this last point that is the root of defendants' troubles, because, as we said, they did absolutely nothing to earn these sums. Soon after Allen left office as Trustee, the Indiana State Board of Accounts discovered the checks written from the Fifth Third Bank account. The Board of Accounts requested Allen, Joshua, and Karras to produce documentation supporting the payments, but naturally they could not do so. Consequently, based on two of the checks mailed to the Trustee's Office by IDWDS, the defendants were charged with two counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346. The government argued two separate theories of mail fraud: first, that the defendants participated in a scheme to defraud the Trustee's Office of money and, second, that the

defendants engaged in a scheme to defraud the Trustee's Office of the intangible right to honest services. Through special verdicts, the jury indicated that it accepted both of these theories, and it convicted the defendants. This appeal followed.

## II

### A

We begin by addressing defendants' argument that the evidence on the mailing element was insufficient to sustain the convictions on the mail fraud counts. We review *de novo* the district court's denial of a motion for acquittal under Federal Rule of Criminal Procedure 29. *United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011). When reviewing a sufficiency claim, the court "consider[s] the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor." *United States v. Frazier*, 213 F.3d 409, 416 (7th Cir. 2000). A conviction will not be overturned unless "the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003).

In order to convict someone of mail fraud, the government must prove beyond a reasonable doubt that the defendants participated in a scheme to defraud and that they used the U.S. mail or knowingly caused another to use the U.S. mail for the purpose of executing the scheme. 18 U.S.C. § 1341; *United States v. Brooks*, 748 F.2d 1199, 1202 (7th Cir. 1984). The defendants take issue

with the second element; they assert that there is insufficient evidence to show that the checks were actually sent by mail from IDWDS to the Trustee's Office, rather than hand-delivered.

The government's proof of mailing was for the most part circumstantial, but there is nothing wrong with that. It proffered the testimony of Angela Lewis, an IDWDS senior fiscal accountant in charge of delivering reimbursement checks. Lewis testified that IDWDS generally sent the checks to the Trustee's Office by mail, but sometimes they were picked up by an Office employee. When sending checks through the mail, IDWDS's office practice was to put the checks in envelopes, run the envelopes through the postage meter, and finally have an IDWDS employee take the envelopes to the post office. The government then presented the two envelopes in which the checks were allegedly mailed. Markings on the envelopes indicated that they had been run through the IDWDS postage meter, but they did not bear any postal markings indicating that they had actually been delivered through the postal service. They did, however, bear notations indicating that the Office had received them. One envelope, run through IDWDS's postage meter on November 27, 2002, had a handwritten note "12/4/02/ak." This note meant that the envelope had been received at the Trustee's Office on December 4, 2002, apparently by defendant Ann Karras. The other envelope, metered on December 19, 2002, was stamped "RECEIVED" at 1:51 p.m. on December 20, 2002. Lewis testified unequivocally that the envelope

metered on December 19, 2002—associated with Count 2—
had been mailed.

While it is easy to imagine stronger evidence, we are
satisfied that this was enough to permit the jury to con-
clude that the envelopes went through the U.S. mail. The
mailing element of mail fraud may be proven by direct
or circumstantial evidence. *United States v. Brooks*, 748
F.2d 1199, 1202 (7th Cir. 1984). Evidence of office
custom and practice often serves as circumstantial proof
of the fact of mailing. See *United States v. Ratliff-White*,
493 F.3d 812, 817-18 (7th Cir. 2007) (making the same
point with respect to wire transfers). The government
cannot rely on an office practice if there is evidence that
a party regularly deviated from the practice, *id.,* but at
the same time, the government need not show that the
office practice was invariable. "[T]he absence of a recol-
lection of departure from that practice" is sufficient.
*United States v. Keplinger*, 776 F.2d 678, 691 (7th Cir. 1985).

Drawing the inferences in the government's favor, as
we must, a reasonable understanding of Lewis's testi-
mony is that when checks were mailed, they were put
through the metering process and delivered to the post
office, and when they were picked up, they never
touched the metering machine. Why should they, in the
latter case? IDWDS would incur the cost of postage as
soon as the envelopes were metered. If the envelopes
were metered, and then picked up by the Trustee's
Office, IDWDS would needlessly be wasting postage.
We have no reason to assume that IDWDS took such
a cavalier attitude toward its funds. The envelopes

here were metered; there is no evidence that the agency hand-delivered any metered mail; and so the jury was entitled to infer that they were mailed.

Defendants resist this conclusion by emphasizing the lack of postal service markings on the envelopes; they assert that this serves as evidence that these envelopes were not mailed. The government, however, rebutted this argument with the testimony of Postal Inspector Mark Shaw. Shaw testified that the envelopes in question were classified as flat, metered mail. In the postal service's jargon, flat mail refers to envelopes that are larger than a normal letter-sized envelope. Metered mail has meter marks, rather than stamps. The Post Office processes flat, metered mail in a specialized machine. Shaw stated that these machines do not spray any markings on the mail, because flat, metered mail does not need to be canceled to prevent re-use. Meter marks are dated, and metered mail is supposed to be sent out on the same date as the one shown by the meter mark. In fact, the Postal Service is authorized to reject mail that is mailed on a date not corresponding with the meter mark. This dating of the meter marks adequately protects against those who might try to save on postage by reusing envelopes with meter marks on them. This testimony was enough to permit the jury to decline to draw an inference in the defendants' favor from the lack of postal markings.

Defendants then argue that the government cannot rely on IDWDS's office practice, because they contend that Lewis admitted that there were deviations to the prac-

tice—that is, sometimes checks were picked up. But the defendants have targeted the wrong office practice. The office practice that matters applies only to *metered* envelopes. And as for that subset, the evidence showed that IDWDS metered only the envelopes that were mailed, and it metered all of that group. To be sure, Lewis's testimony leaves something to be desired on this point. Neither the government nor the defense asked Lewis in detail about what happened when envelopes were picked up by the Trustee's Office. (An answer to the question, "Were metered envelopes ever picked up?", would have been useful on this point.) But as we said, drawing the inferences in the government's favor, it is a reasonable interpretation of Lewis's testimony that the office practice was to meter all and only envelopes that were mailed. There is no example of a deviation from this practice. As the envelopes here were metered, the jury was entitled to conclude that they were also mailed.

Defendants finally suggest that it was possible that the metered mail was picked up. The offices were only three blocks apart and the envelope metered on December 19, 2002 was delivered within a day. The defendants argue that this was more consistent with pick-up.

As an initial point, this argument does not implicate Count 1. The envelope associated with Count 1 took seven days to deliver, and by the defendants' own reasoning this would be more consistent with mailing than hand pick-up. With respect to Count 2, as we said in *Keplinger*, the government need not show the office

practice was invariable and that deviation was impossible. Though hand delivery was possible, this by itself is not enough for the defendants. Furthermore, the claim that the one-day gap was more consistent with hand delivery is pure speculation. Next-day service with first-class mail is not uncommon when the delivery and receipt locations are in less populated areas or are in close geographical proximity. The jury was entitled to weigh the delivery time against the other evidence—including Lewis's unequivocal statement that the Count 2 envelope was mailed—and decide in the government's favor.

B

We next address defendants' argument that *Skilling v. United States*, 130 S. Ct. 2896 (2010), compels us to reverse their convictions, because they were convicted of honest services mail fraud. The defendants did not raise this issue below, so we review for plain error. *United States v. Harris*, 230 F.3d 1054, 1058 (7th Cir. 2000). Before we can correct such an error, there must be "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *Johnson v. United States,* 520 U.S. 461, 467 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). Even then, only if (4) the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings" may we exercise our discretion to address it. *Id.* (internal quotation marks omitted).

In *Skilling*, the Supreme Court pruned the scope of the honest services mail fraud offense to clarify that it

encompasses only bribery and kickback schemes, in order to save 18 U.S.C. § 1346 from unconstitutional vagueness. 130 S. Ct. at 2933. The government has conceded that the defendants' scheme in this case falls outside the offense defined in *Skilling*. But that is not the end of the matter. Here, the special verdicts unambiguously reveal that the jury accepted both of the prosecution's theories: honest services fraud, and a conventional fraudulent scheme to obtain money. The latter form of mail fraud is untouched by *Skilling* and remains illegal. *United States v. Segal*, 2011 WL 1642831, at *1 (7th Cir. May 3, 2011). Thus, even if honest services fraud is erased from the picture, the jury would have convicted on the monetary fraud theory.

The defendants riposte by claiming that the jury instructions did not properly indicate that there were two separate theories to consider. A look at the language of those instructions is enough to answer this point:

> Instruction 9
>
> Counts 1 and 2 of the indictment allege that [defendants] devised and participated in a scheme and artifice to (1) defraud the Calumet Township and its citizens of their intangible right to honest services of public servants, and (2) to obtain money from Calumet Township by means of materially false and fraudulent pretenses, representations, promises and material omissions.
>
> Instruction 16
>
> Counts 1 and 2 of the indictment allege that the defendants committed certain specific acts as part of the

scheme to defraud. The government need not prove that each and every specific alleged act was committed by a defendant. However, the government must prove that a defendant committed at least one of the specific acts which are alleged in that count. In order to find that the government has proved a defendant committed a specific act, the jury must unanimously agree on which specific act the defendant committed.

For example, if some of you find a defendant participated in a scheme to obtain money and the rest of you find that same defendant participated in a scheme to deprive the citizens of Calumet Township of honest services, then there is no unanimous agreement on the scheme. On the other hand, if all jurors find that a defendant schemed to obtain money or schemed to deprive the citizens of Calumet Township of honest services, then there is unanimous agreement.

No one could miss the fact that two theories were in play: the court said so directly in the first paragraph and offered an additional explanation in the last.

In a last-ditch effort to make use of *Skilling*, the defendants argue that the evidence on monetary fraud was so thin that the jury would not have accepted that theory unless it was influenced by the improper honest-services part of the case. The government, they say, made things worse by failing to indicate clearly which evidence pertained to what. In this respect, however, we do not find the case to be a close one. The jury found that the defendants took over $100,000 that IDWDS sent

to the Trustee's Office. (Since the true amount to which
the Office was entitled under the program was far less
than that, it seems that IDWDS was also a victim of the
fraud. The fact remains, however, that the immediate
victim was the Office. We offer no comment about the
question whether the Office has a duty to reimburse
IDWDS from any funds that it receives by way of restitu-
tion.) There was substantial evidence supporting that
finding, including checks mailed to the Office, deposits
of those checks in a private bank account, and distribu-
tion of the monies to the defendants. There is nothing
objectionable about the potential use of this evidence
for more than one purpose. Once the district court in-
structed the jury properly, as we have found that it did,
the jury was capable of considering the evidence
relevant to each theory. We presume that the jury
follows the district court's instructions. *United States v.
Clarke*, 227 F.3d 874, 883 (7th Cir. 2000). In summary, we
see no reversible error here, much less plain error.

### C

Finally, we turn to the defendants' complaint about
the way the court instructed the jury on their advice-of-
counsel defense. We review jury instructions *de novo*,
but we will reverse a conviction only if the instructions
as a whole misled the jury as to the applicable law.
*United States v. Quintero*, 618 F.3d 746, 753 (7th Cir. 2010).

Defendants offer two criticisms of the instructions
given by the district court. First, they assert that they
were not relying on an advice-of-counsel defense at all.

Instead, they say that they were using Attorney Work's testimony to negate the mental state required for mail fraud—that is, intent to defraud. The defendants claim that because of this misunderstanding, the district court's instruction misled the jury about the relevance of Attorney Work's testimony. Second, the defendants argue that the instruction improperly shifted the burden of persuasion from the government onto them.

Once again, the actual instructions the court gave on good faith and advice of counsel provide our starting point:

Instruction 22

Good faith on the part of a defendant is inconsistent with intent to defraud, an element of both of the charges in this case. The burden is not on any of the defendants to prove his or her good faith; rather, the government must prove beyond a reasonable doubt that the defendants acted with intent to defraud.

Instruction 22A

You may consider the advice given by counsel to a defendant in deciding whether the defendant possessed the requisite intent to defraud if you find that before taking action, the defendant in good faith sought the advice of an attorney whom the defendant considered competent for the purpose of securing advice on the lawfulness of the defendant's possible future conduct, and made a full and accurate report to the attorney of all material facts which the defendant knew, and acted strictly in accordance

with the advice of the attorney who had been given
a full report.

A closer look at the defendants' first argument shows
why it is misconceived. They say that they were using
the testimony of Attorney Work about the legal advice
he gave to them in an effort to show that they acted
in good faith and thus not with the intent to defraud.
But this is exactly what the advice-of-counsel defense
does. It is not a stand-alone defense; rather, information
about advice of counsel sheds light on the question
whether the defendants had the required intent to
defraud. *United States v. Van Allen*, 524 F.3d 814, 823 (7th
Cir. 2008). That is, "a lawyer's fully informed opinion
that certain conduct is lawful (followed by conduct
strictly in compliance with that opinion) can negate the
mental state required for some crimes, including fraud."
*Id.* (quoting *United States v. Roti*, 484 F.3d 934, 935 (7th
Cir. 2007)). Thus, according to the defendants' own charac-
terization of their defense, they were in fact relying pre-
cisely on the advice-of-counsel defense as described in
*Van Allen* (and the jury instructions). This is exactly
what the district court told the jury; indeed, its instruc-
tions come almost *verbatim* from *Van Allen*, 524 F.3d at 824.

Defendants' argument regarding the burden of persua-
sion is similarly unavailing. It is true that Instruction 22A
itself is silent on burdens. But there was a good reason
for that. When describing the good faith defense in the
directly preceding Instruction 22, the district court
stated that the burden to disprove the defendants' good
faith was the government's. Furthermore, in Instruc-

tion 10, the district court explained that "[t]he government has the burden of proving the guilt of the defendants beyond a reasonable doubt"; that "[t]he burden of proof stays with the government throughout the case"; and that "[t]he defendants are never required to prove their innocence or to produce any evidence at all." The instructions as a whole thus leave no doubt that the government bore the burden at all times.

\* \* \*

Finding no merit in any of the defendants' challenges to their convictions, we AFFIRM the judgment of the district court.