In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1465

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

THOMAS R. PHILPOT,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:11-cr-00133 — **James T. Moody**, *Judge.*

ARGUED SEPTEMBER 13, 2013 — DECIDED OCTOBER 22, 2013

Before BAUER, FLAUM, and ROVNER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Thomas Philpot, the former Clerk of
Lake County, Indiana, took approximately $25,000 in incentive payments from a federally funded child-support fund
without the required approval of the county fiscal body. He
was charged with three counts of mail fraud and two counts
of theft from a federally funded program. A jury convicted
Philpot on all counts—although the district court later acquitted him on two of them—and the court sentenced Phil-

pot to eighteen months in prison. Philpot now appeals his conviction and his sentence, arguing that he should be acquitted on the remaining counts. In the alternative, he argues that he is entitled to a new trial, and that the district court improperly assessed the loss amount in his sentencing. We affirm the district court on all grounds.

## I. Background

Title IV-D of the Social Security Act regulates certain aspects of child-support systems. One provision orders the federal government to "make an incentive payment to each State for each fiscal year" based on how effectively their individual child-support systems are functioning. 42 U.S.C. § 658a(a). The federal government disburses Indiana's incentive payment to the Indiana Department of Child Services, which disburses the federal funds to the counties (a portion of the money goes to a county incentive fund, another to the operating fund of the county prosecutor, and the rest to the operating fund of the county clerk). Ind. Code § 31-25-4-23(a). Indiana chooses to give its counties a relatively free hand in directing their Title IV-D money once the payments have been distributed, with one important caveat: "amounts received as incentive payments may not, without the approval of the county fiscal body, be used to increase or supplement the salary of an elected official." *Id*. § 31-25-4-23(c).

Thomas Philpot, a licensed attorney, was elected Lake County Clerk in 2004, and served until the end of 2009. During many of these years, he and two of his subordinates in the Clerk's Office received thousand-dollar incentive payments from the Clerk's share of the IV-D funds. (Personnel who worked on child-support matters full-time also received IV-D bonuses, although in much smaller amounts.) Philpot

learned of the IV-D incentive fund—and the possibility that it might be used to pay bonuses to heads of the Clerk's Office—from a 2004 conversation with Rochelle Vandenburgh, the Director of Child Support for Lake County.[1]

In 2004, Philpot received a $3,101 bonus; in 2005, he received $3,146; in 2006, $4,249. The Lake County Council never approved these payments. Thus, in each of these years Philpot's bonuses violated the Indiana statute.

In March 2007 a government official suggested that some recipients of bonus money might not be eligible because it was not clear that they consistently spent time on child-support matters. This inquiry did not appear to be connected to Indiana's approval requirement for elected officials, however, since it concerned Philpot's non-elected subordinates, too. In any event, Philpot did not take a bonus in 2007—although he was scheduled to receive one, his deputy directed the Clerk's financial manager to strike the request—nor in 2008. His bonuses resumed in 2009. He received $9,101 in January and another $5,105 in October—both times without Council approval. Shortly thereafter, he resigned as Clerk to take up a new post.

Word of Philpot's IV-D bonuses got out to the media in 2010, and after consulting with an attorney, he ultimately decided to return the payments (with interest) to Lake County. He was later charged with three counts of mail fraud in violation of 18 U.S.C. § 1341 and two counts of theft from a federally funded program in violation of 18 U.S.C.

---

[1] At trial, Vandenburgh testified that she did not discuss any requirement that Philpot get approval from the county fiscal body before taking a bonus.

§ 666(a)(1)(A). Philpot filed a pretrial motion to transfer venue to the Northern District of Illinois, arguing that pretrial publicity prevented him from receiving a fair trial in Indiana, but it was denied. He also filed a motion to dismiss the indictment, alleging that the government submitted false and misleading evidence to the grand jury. The district court postponed consideration of the motion until the close of trial, at which time the court denied it as well.

Both mail fraud and theft from a federally funded program contain a *mens rea* requirement of knowledge and intent to defraud. Thus, while Philpot conceded at trial that his bonuses did not comply with Ind. Code § 31-25-4-23, he argued that he had acted in good faith in taking them.

A key issue at trial was the significance of a legal opinion Philpot requested from his longtime acquaintance, David Saks, who Philpot had hired as the Clerk's contract attorney. Saks testified that Philpot approached him in November 2008 about a situation that "fell through the cracks" the previous year. Philpot asked if it was "too late to act on this situation," handed Saks a scrap of paper with a citation to Ind. Code § 31-25-4-23, and asked Saks to analyze the statute and get back to him as quickly as possible. Saks testified that he was unclear on the precise scope of the assignment and that this was a tighter timeline than he was used to.

After looking at the statute, Saks said he determined that Philpot was asking him "whether or not you had to take [the IV-D money] in the year … the federal money was received, whether or not it could be encumbered and taken in a subsequent year." On November 19, he wrote to Philpot that he

was in "complete compliance" with § 31-25-4-23.[2] At trial, Philpot introduced this conclusion to show his good faith in continuing to take bonuses from the IV-D fund. The jury disagreed, though, and it convicted him on all five counts.

Following his conviction, Philpot filed a number of post-trial motions. The district court granted his motion for acquittal on Counts 1 and 4, which dealt with the bonuses he took prior to consulting with Saks, because it found there was no evidence that Philpot knew of § 31-25-4-23 before

---

[2] Saks's letter read:

The question was posed as to the requirements necessary to comply with I.C. 31-25-4-23. This statute deals with incentive payments for enforcing and collecting assigned child support rights; the amount and terms thereof.

Pursuant to this section of the Indiana Code, incentive payments are to be made by the Title IV-D Agency directly to the county and deposited in the county treasury for distribution in a specified manner. The Clerk of the Circuit Court, pursuant to the formula, is to receive $4,000.00 for the year 2007. Distribution from the county treasury is not made pursuant to I.C. 36-2-5-2 (fixing of tax rates and appropriations). Rather, simple approval of the county fiscal body to supplement the salary of the elected official is necessary.

At the onset of the year in question, a fund under the auspices of the clerk known as "Clerk's Child Support IV-D #428 Fund" was in existence. This fund had a specific line item enumerated as line item #41390 styled as "supplemental pay." This was brought before the fiscal body and was approved and thus there was complete compliance with I.C. 31-25-4-23.

The funds that are the subject of the above-mentioned procedure are still in the account and are available for distribution. Apparently, the funds have to be transferred out of a general line item to the relevant line item for payment.

2008. However, it sustained the convictions on the post-2008 counts (Counts 2, 3, and 5). The district court also denied Philpot's motion for a new trial, which was based on the court's supposedly erroneous jury instructions, its refusal to reopen the evidence to permit Philpot to call an additional witness, and the government's closing argument.

The district court sentenced Philpot to 18 months in prison followed by two years of supervised release and a $10,000 fine. Philpot objected that the court had miscalculated his loss amount, since he returned the bonus money to the County before the loss was detected, but the objection was overruled.

## II.  Discussion

Philpot has appealed numerous issues, which we will address in turn, describing additional facts as necessary. We begin with his pretrial motions, proceed to issues relating to the trial, and conclude with his sentencing argument.

### A.  The pretrial motions

#### 1.  Motion to transfer venue

Philpot moved to transfer venue to the Northern District of Illinois pursuant to Federal Rule of Criminal Procedure 21, arguing that local media coverage was so inflammatory and pervasive that he could not receive a fair trial in northwest Indiana. The magistrate judge reviewed the motion and concluded that the press coverage in the case had not been so pervasive as to compromise Philpot's fair trial rights. He noted that many of the articles Philpot complained of were factual in nature, and many preceded the trial by over a year. The magistrate judge also did not believe that the pretrial publicity was any more severe than it had been for other

public corruption cases that had been tried in the Northern District of Indiana.

We review a denial of a request for change of venue for abuse of discretion, which means that the facts must "compel—and not merely support—a finding that a change in venue is necessary." *United States v. Nettles*, 476 F.3d 508, 513 (7th Cir. 2007). Defendants can adduce evidence of Rule 21 prejudice by showing that individual jurors were actually exposed to material that prevented them from judging the case impartially. *See id.* Alternatively, defendants can show presumed prejudice, which occurs when "pervasive and inflammatory pretrial publicity makes juror bias inevitable." *Id.* (internal quotation marks omitted).

Philpot does not seriously argue actual prejudice, nor do we see any indication that it existed. Instead, Philpot argues that the pretrial media coverage of his case created a circus atmosphere that made juror bias substantially likely. In support, he offers a list of numerous newspaper articles and editorials discussing the controversy surrounding the bonuses. He also points to assorted reader comments posted to the stories' online pages, which he claims "reveal a widespread hostility to Philpot as well as a certainty that he is guilty."

In *Skilling v. United States*, 130 S. Ct. 2896, 2915–16 (2010), the Supreme Court set forth a number of factors to assess presumed prejudice: the size and characteristics of the community where the crime occurred, the nature of the news stories, and the time that elapsed between the news coverage and the trial. None of these factors lead us to believe that Philpot was unable to receive a fair trial in the Northern District of Indiana. Northwest Indiana may not be as populous as, say, Chicago, but neither is it a small town. Roughly

600,000 people live in Porter and Lake Counties, from which the jury pool was drawn. *Cf. Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991) (plurality opinion) (reduced likelihood of prejudice where the venire had a population in excess of 600,000 people). Most of the news stories to which Philpot objects were factual in nature. Moreover, few readers would take the comments section of an online news story to be anything but mostly-anonymous opinions. Finally, most of the media coverage occurred over a year before trial, and long periods went by with few or no articles on the subject. This is hardly the kind of circus atmosphere required for presumed prejudice.

The Supreme Court has instructed that "juror impartiality … does not require ignorance" and that "[a] presumption of prejudice … attends only the extreme case." *Skilling*, 130 S. Ct. at 2915 (emphasis omitted). Especially in light of the magistrate's observation that the pretrial publicity was no more inflammatory than other local political corruption cases that had been successfully tried in the district, we see no grounds for concluding that the judge abused his discretion in denying the motion.

### 2. Motion to dismiss the indictment

Philpot also moved to dismiss his indictment, alleging that the government presented false and misleading evidence to the grand jury. The district court denied the motion, a decision we also review for abuse of discretion. *United States v. Useni*, 516 F.3d 634, 656 (7th Cir. 2008).

As an initial matter, the government argues that any misconduct before the grand jury cannot have prejudiced Philpot because a petit jury later convicted him of the charges for

which he was indicted, and a "petit jury's guilty verdicts render harmless any possible error in the grand jury proceedings." *United States v. Morgan*, 384 F.3d 439, 443 (7th Cir. 2004); *see also United States v. Vincent*, 416 F.3d 593, 601–02 (7th Cir. 2005). If so, then even if the government did knowingly present false evidence to the grand jury and even if that evidence did prejudice Philpot (both points it contests), his argument still fails.

There is some daylight between *Morgan* and Philpot's case: here, although the jury initially found Philpot guilty of all counts, the district court granted acquittal on two of them. However, we think that this is a distinction without a difference. All Philpot asks for on appeal is for us to reverse his three remaining counts of conviction. And insofar as *these* counts are concerned, *Morgan*'s rationale remains sound. As we have put it, a rule designed "to protect the innocent from being indicted … should not be enforced by reversing a conviction obtained after trial—because we *know*, as surely as courts 'know' anything, that the convicted defendant is not a member of the class of beneficiaries of the rule." *United States v. Fountain*, 840 F.2d 509, 515 (7th Cir. 1988).

Of course, Philpot does offer several reasons to think that the jury's convictions on the three remaining courts are invalid. Were we to accept any of these contentions, we would not necessarily "know" that Philpot is not a member of the class of innocent persons, and we would therefore need to make a deeper inquiry into his grand jury arguments. But we do not accept these contentions (as we shall explain below), and so we conclude that the district court did not abuse its discretion when it denied the motion to dismiss the indictment.

**B. The alleged trial misconduct**

Philpot takes issue with three aspects of his trial. First, he argues that there is insufficient evidence to support the jury's guilty verdict on Counts 2, 3, and 5 (i.e., the counts on which he was not acquitted following the jury verdict). Second, he argues that is entitled to a new trial because the prosecutor made improper statements in his closing argument. Finally, he argues for a new trial because the trial court erred by providing an advice-of-counsel instruction to the jury or, in the alternative, refusing to let Philpot reopen the case to call a witness. In our view, none of these claims has merit.

**1. The sufficiency of the evidence**

We review the denial of a motion for judgment of acquittal de novo, and ask whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Pree*, 408 F.3d 855, 865 (7th Cir. 2005). Here, we must decide whether the jury had sufficient evidence to conclude that Philpot acted knowingly and with intent to defraud, rather than just negligently, when he took the bonus payments. In the context of the mail fraud statute, "[i]ntent to defraud requires … a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing loss to another." *Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1005 (7th Cir. 2004). Similarly, theft from a federally funded program requires a specific intent to convert money or property from that program. *United States v. Weaver*, 220 F. App'x 88, 91 (3d Cir. 2007).

We begin with a piece of evidence that both parties agree is insufficient to prove the *mens rea* elements of the charged offenses. The government offered four "cooperative agreements" that Philpot signed between 2004 and 2009. These agreements, which Indiana requires from entities receiving IV-D funds, state that the Clerk will comply with "applicable state law, CSB [Child Support Bureau] policy and State Board of Accounts' rules and instructions." They do not specifically reference Ind. Code § 31-25-4-23, however. Because there was no evidence other than the cooperative agreements to show that Philpot knew of § 31-25-4-23 during the time covered by Counts 1 and 4 of the indictment, the district court granted Philpot's motion of acquittal on those counts following the trial. The government does not challenge that ruling here.

Counts 2, 3, and 5, which pertain to the two bonuses Philpot accepted in 2009, are a different matter. Both parties apparently agree that Philpot knew of the statute by November 2008. Recall that in that month, Philpot handed David Saks a piece of paper with a citation to § 31-25-4-23, and asked him to investigate a situation that had "fallen through the cracks" a year earlier. The question we face is whether Philpot intentionally took the bonus money in 2009, knowing that he did not have the Lake County Council's approval.

The government offered three pieces of circumstantial evidence that it says permitted a rational jury to conclude that Philpot acted knowingly and with intent to defraud in 2009. First, it notes that the statutory requirement that Philpot get approval before taking a bonus is straightforward. *See* Ind. Code § 31-25-4-23(c) ("[I]ncentive payments may not, without the approval of the county fiscal body, be used

to increase or supplement the salary of an elected official.")
Once Philpot—a licensed attorney and elected official with
many years of experience—was aware of the statute, he did
not need the advice of counsel to know that he lacked the
approval of the "county fiscal body" to supplement his sala-
ry.

Second, on the same day that Philpot received Saks's re-
sponse, Sandra Radoja, Philpot's deputy, directed the Clerk's
financial manager to place an item on the Council agenda.
Radoja testified that she did so at Philpot's direction; or, at
least, that she did so using Philpot's signature, which she did
not use without consulting with him beforehand. The item
requested that the Council move $22,177 in the "Clerk's
Child Support IV-D #428 Fund" from an "other equipment"
line item to a "supplemental pay" line item. This piqued the
interest of the Council President, Christine Cid, who asked
the Council's attorney to look into the matter. Cid later spoke
to Philpot's personnel manager, Gus Trakas, and informed
him that he could take a bonus from the IV-D fund, but that
Philpot could not unless he first received Council approval.
Shortly thereafter, Philpot's deputy requested that the items
be removed from the agenda, and the Council never voted
on them.

The government argues that this maneuvering over the
Council agenda supports an inference that Philpot was at-
tempting to trick the Council into approving bonus pay-
ments, only to withdraw the request when he realized Cid
was becoming suspicious. Philpot argues that the requests
the Clerk's Office placed on, and then removed from, the
Council agenda are irrelevant. Among other things, he says
that there is no direct evidence that Philpot was involved,

the transfers did not specifically reference Philpot's bonus, and the request was visible on the Council's public agenda even after it was withdrawn. These counterarguments are certainly plausible—so that a jury could very well credit them instead of the government's version—but we cannot say that they are so convincing that *no* rational juror could reject them, which is the standard we must apply on appeal.

Finally, the government offered testimony from Gus Trakas. Trakas testified that he told Philpot about his discussion with Christine Cid, including her instruction that Philpot needed to get Council approval in order to take a bonus for himself. Trakas could not recall exactly when he and Philpot had this conversation; he estimated it occurred somewhere between November 2008 and January 2009.

All this adds up to a welter of inferences about Philpot's actual state of mind when he took the IV-D bonuses in 2009. But we are not tasked with resolving that confusion. The question we must answer is a simpler one: is it true that "viewing the evidence in the light most favorable to the Government, no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt"? *Pree*, 408 F.3d at 865.

Philpot knew of § 31-25-4-23 by November 2008 at the latest. As the government notes, this was not a complicated provision. It said that Philpot, an elected official, could not take supplemental pay from the IV-D program without Council approval. Furthermore, based on his conversation with Trakas, he knew that the Council President did not believe that he had approval. Trakas estimated that this conversation occurred between November 2008 and January 2009—so a jury could certainly find that the conversation oc-

curred before Philpot took the first of his two IV-D bonuses in January 2009. From this evidence alone, we think that a jury could conclude that Philpot knowingly violated Indiana law.[3]

Philpot argues, however, that even though he knew of the approval requirement, he thought that he had complied with it. That is because of the letter from David Saks stating that Philpot was in "complete compliance" with Indiana law:

> At the onset of the year in question, a fund under the auspices of the clerk known as "Clerk's Child Support IV-D #428 Fund" was in existence. This fund had a specific line item enumerated as line item #41390 styled as "supplemental pay." This was brought before the fiscal body and was approved and thus there was complete compliance with I.C. 31-25-4-23.

Because he honestly believed this advice, Philpot claims, he could not have acted with the requisite *scienter*, even if Saks's conclusion later turned out to be wrong.

The parties strongly dispute what to make of this letter. According to the government, Philpot procured it in bad faith: he knew Saks was not an expert in this area of the law, yet pressured him to quickly produce an opinion; he told Saks that the IV-D bonuses "fell through the cracks" in 2007, when in fact he had been slated to receive a bonus only to have his name struck after the state raised concerns; and he did not mention to Saks that he had never received Council

---

[3] We note that this conclusion was permissible even if the jury concluded the government's theory about the attempt to trick the Council by manipulating the agenda was a red herring.

approval for any of his previous bonuses.[4] The government even suggests that Philpot may have purposely sought out Saks, with whom he had a longstanding professional relationship, in order to more easily obtain a favorable opinion.

In reply, Philpot argues that no reasonable jury could conclude that he misled Saks. Saks told the jury that Philpot was looking for his "honest opinion," and that Saks had full access to personnel in the Clerk's Office and any budget materials he needed to complete his task. Philpot suggests that to the extent Saks implicated him in his mistake, he was primarily concerned with shifting blame and his testimony should be disregarded as self-serving.

As the district court noted, Saks's testimony was "full of internal conflicts and can be interpreted in many different ways." But again, that is not the question before us on appeal. We must instead decide whether a jury could have rationally concluded that Philpot knew his bonuses violated state law. We conclude that it could, even assuming that Philpot procured Saks's letter in good faith.

For reliance on a lawyer's opinion to negate a mental state, that reliance must be reasonable and in good faith. "If a person is told by his attorney that a contemplated course of action is legal but subsequently discovers the advice is wrong or discovers reason to doubt the advice, he cannot hide behind counsel's advice to escape the consequences of his violation." *United States v. Benson*, 941 F.2d 598, 614 (7th Cir. 1991), *amended*, 957 F.2d 301 (7th Cir. 1992); *see also United States v. Urfer*, 287 F.3d 663, 664 (7th Cir. 2002) ("[T]he rea-

---

[4] At trial, Saks stated that if he had known that Philpot never received approval, he would have given a different legal opinion.

sonableness of a lawyer's advice is indeed relevant to a determination of willfulness."). It does not seem reasonable for Philpot to rely on Saks's bare-boned conclusion that there was "complete compliance" with the Indiana statute when Philpot himself knew that the County Council never approved his bonus payment, and when he knew that Council President Cid had told Trakas that Philpot lacked approval—or so a jury could find.[5]

It is certainly possible that a rational jury could have sided with Philpot and concluded that he acted in good faith when he accepted the bonuses in January and October 2009. This jury did not, however. It concluded that Philpot acted knowingly and with intent to defraud when he accepted IV-D money without Council approval. We believe that, looking at the totality of the evidence in the light most favorable to the government, this conclusion was a permissible one.

## 2. The prosecutor's closing argument

Philpot next argues that, even if we do not reverse the district court's partial denial of the motion for acquittal, we ought to grant him a new trial because of prejudicial errors the prosecutor made in his closing argument to the jury. Philpot identifies the following improper arguments:

---

[5] Trakas testified that after he told Philpot about Cid's comments, Philpot replied that he did not need Council approval because Saks's letter indicated that he had satisfied the Indiana statutory requirement. That could support an inference that Philpot genuinely thought he did not need—or already had—Council approval. But it also could support an inference that Philpot unreasonably relied on Saks's letter, or even that he knew he was taking bonus payments without approval and hoped to avoid drawing attention to himself. In the end, it was the jury's job to decide which version of this story to believe.

- The suggestion at several points that the cooperative agreements Philpot signed as Clerk directed him to the relevant Indiana statutes;

- The statement that Philpot consulted with Saks after Cid raised questions about his needing Council approval to take a bonus;

- The misrepresentation of Saks's answer to the question whether Philpot ever mentioned that he did not have Council approval—"Well, no, that's the whole ball game"—to suggest Philpot intentionally withheld critical information; and

- The repeated statement that Philpot was using his position to "writ[e] himself checks."

The district court found that some of these statements were unsupported by the evidence. However, the court did not think any were so inflammatory or prejudicial that they warranted a new trial.

Philpot objected to these remarks at trial, and we review the decision to overrule the objections for abuse of discretion. *United States v. Clark*, 535 F.3d 571, 580 (7th Cir. 2008). We must first consider whether the challenged statements, standing alone, are in fact improper. If they are, we consider whether the statements, in the context of the record as a whole, denied the defendant his right to a fair trial. *Id.* That said, "improper statements made during closing argument are rarely reversible error." *Id.* at 581.

We begin with the prosecutor's references to the cooperative agreements—references that were indeed improper. As the district court observed, the agreements do not specifically reference Ind. Code § 31-25-4-23, so the suggestion that

they "told [Philpot] exactly where to look" was incorrect. We also find the prosecutor's description of the timeline surrounding Saks's letter to be improper. In his closing and rebuttal arguments, the prosecutor told the jury that Philpot went to Saks because "all heck was breaking loose with Cid finding out about this and he needed some cover, and Mr. Saks was the closest ally." Yet that is not what the evidence showed: Cid made her inquiries upon noticing the supplemental payment item on the Council agenda, which Radoja had placed there after a week after Philpot spoke to Saks.

However, we find nothing improper in the prosecutor's accurate quotation of Saks's testimony about "the whole ball game," particularly because (as the district court noted) Philpot did not object to this statement when Saks was on the stand. Nor do we think that the prosecutor's suggestions that Philpot was "writing himself checks" were unfair or misleading. After Philpot objected to this phrasing, the prosecutor explained that he was speaking figuratively about the process that Philpot used to take bonuses without drawing the Council's attention.

We next consider whether the two improper statements—the references to the cooperative agreements and the chronological mix-up about Cid's conversation with Trakas—prejudiced Philpot's right to a fair trial. Six factors guide this inquiry: (1) whether the prosecutor misstated the evidence; (2) whether the remark implicated a specific right; (3) whether the defendant invited the remark; (4) whether the district court provided an effective curative instruction; (5) whether the defendant had an opportunity to rebut the remark; and (6) the weight of the evidence against the defendant. *Clark*, 535 F.3d at 580–81. At bottom, we ask wheth-

er "the prosecutors' comments so infected the trial with un-
fairness as to make the resulting conviction a denial of due
process." *Id.* at 851 (internal quotation omitted) (quoting
*Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

We agree with the district court that the cooperative
agreements did not unfairly prejudice Philpot with respect
to the counts on which he was convicted. The agreements
were most relevant to the pre-2008 counts, because there was
no other evidence showing Philpot knew of the Indiana re-
quirement at that time. Philpot has been acquitted on these
counts, however, so any error is harmless. All of the counts
of conviction, by contrast, involve funds taken in January
and October 2009, and Philpot concedes that he knew about
the statute then. Philpot argues that the misstatement about
the cooperative agreements may have led the jury to believe
that he did not consult with Saks in good faith, but we do
not see how that follows, especially as the government never
intimated this inference in its closing argument.

Jumbling up the timeline, as the government did in its
closing, gives us more pause. As the district court noted, the
*Clark* factors cut both ways on this point. Philpot did not in-
vite the remark, and he could not rebut it the second time it
was made in the government's rebuttal. On the other hand,
the statement did not implicate any specific rights, the dis-
trict court frequently reminded the jury that statements
made during the closing argument are not evidence, and the
weight of the evidence against Philpot was strong (though
not overwhelming). At the end of the day, we must be mind-
ful that "the district court is in a superior position to judge
the seriousness of the incident in question, particularly as it
relates to what has transpired in the course of the trial."

*United States v. Johnson*, 655 F.3d 594, 602 (7th Cir. 2011) (internal quotation marks omitted). In light of the closeness of the question, we cannot conclude that the district court abused its discretion when it denied the motion for a retrial.

### 3.   The advice-of-counsel instruction

Finally, Philpot takes issue with the advice-of-counsel instruction the district court gave the jury over his objection. He contends that the instruction should not have been given at all because he did not offer an advice-of-counsel defense. Rather, his defense was that he took the bonuses in good faith. He further contends that, by drawing the jury's attention to Saks's opinion and away from Philpot's actual argument—which relied on additional indicia of good faith—the instruction unfairly prejudiced his case.

We review claims of instructional error de novo, but will reverse the district court's denial of a new trial motion only if the instructions as a whole misled the jury as to the law. *United States v. Joshua*, 648 F.3d 547, 554 (7th Cir. 2011). In *Joshua*, we concluded that an advice-of-counsel instruction was appropriate even though the defendant characterized his argument as good faith because, labels aside, the defenses operate to the same end. *See id.* (noting that advice of counsel "is not a stand-alone defense; rather, information about advice of counsel sheds light on the question whether the defendants had the required intent to defraud"). That is equally true here. The district court's pattern instruction explained that "[i]f the defendant relied in good faith on the advice of an attorney that his conduct was lawful, then he lacked the intent to defraud required to prove the offenses charged in Counts Two, Three, and Five of the Indictment."

Philpot attempts to distinguish *Joshua* by pointing out that although the attorney in that case was called to the stand by the defendant, here Saks testified for the government. However, Philpot is the one responsible for introducing Saks's letter: he moved to admit it during his cross-examination of Gus Trakas. More importantly, it is still the case that "information about advice of counsel sheds light on the question whether the defendants had the required intent to defraud," *Joshua*, 548 F.3d at 554, and the district court did not err in explaining as much to the jury.

In the alternative, Philpot argues that, even if the instruction was appropriate, the district court abused its discretion by not permitting him to reopen his case in order to introduce testimony from attorney John Dull. Philpot consulted with Dull, the attorney for the Lake County Commissioners, in early 2010 about a newspaper article criticizing him for taking IV-D bonuses without Council approval. After researching the law and reviewing county records, Dull concluded that Saks's 2008 letter was based on a mistake of fact and advised Philpot to return the bonuses to the County. Philpot complied the next day.

Philpot filed his motion to reopen the day after the parties rested. The district court denied it, reasoning that Dull's testimony was not relevant because he did not meet with Philpot until long after the conduct alleged in the indictment had concluded. We review this decision for abuse of discretion. *United States v. Medina*, 430 F.3d 869, 879 (7th Cir. 2005).

Philpot argued that Dull's testimony was relevant to whether Philpot misled Saks in 2008. His theory was that, because Dull came to the correct conclusion based on the information in the newspaper article, Philpot acted reasonably

in relying on Saks's earlier conclusion based on similar in-
formation. But Dull and Saks were not acting on the same
information. The 2010 news story reported that Philpot had
taken several IV-D bonuses and suggested that he might not
have received the required Council approval. That conveyed
a very different picture than Philpot's statement to Saks that
a matter "slipped through the cracks." More generally, Phil-
pot's actions after his bonuses were reported in the press
shed little or no light on his state of mind two years earlier.
The district court did not abuse its discretion by denying the
motion to reopen.

## C.  The sentencing determination

Philpot's final argument is that the district court improp-
erly calculated the loss amount when determining the guide-
lines range for sentencing. He claims that, because he volun-
tarily repaid his bonuses to Lake County, the court ought to
have given him a "credit against loss" for sentencing pur-
poses. We review the district court's application of the guide-
lines de novo and its findings of fact for clear error. *United
States v. Natour*, 700 F.3d 962, 975 (7th Cir. 2012).

Application Note 3(E) to Section 2B1.1 of the Sentencing
Guidelines provides that any loss created by the offense
shall be reduced by "[t]he money returned … by the defend-
ant … to the victim before the offense was detected."
U.S.S.G. § 2B1.1 n.3(E)(i). It further states that "[t]he time of
detection of the offense is the earlier of (I) the time the of-
fense was discovered by a victim or government agency; or
(II) the time the defendant knew or reasonably should have
known that the offense was detected or about to be detected
by a victim or government agency." *Id.*

The district court rejected Philpot's credit-against-loss argument at the sentencing hearing. As it explained in a subsequent opinion denying Philpot's motion for bond pending appeal, "Philpot paid the money back after consulting John Dull, who opined that the bonus payments Philpot took were improper and should be paid back. Dull at the time was the attorney for the Lake County Commissioners, meaning that Lake County, a victim, knew of the loss before Philpot paid it back." Philpot now contends that although Lake County knew of its *loss* prior to his repayment, it is not clear that it knew that Philpot had committed a *crime*. Indeed, at the sentencing hearing, Dull testified that he did not think Philpot could face criminal charges for his conduct.

In *United States v. Peugh*, 675 F.3d 736 (7th Cir. 2012), *rev'd on other grounds*, 133 S. Ct. 2072 (2013), we considered a similar argument. There, the defendants managed to repay a $471,000 overdraft fee resulting from their check-kiting scheme. Because the defendants were not charged with a crime until seven years later, they contended that they were entitled to a loss reduction for returning the overdraft money to the bank before the offense was detected by the victim. *Id.* at 742. We thought otherwise, since "[a] victim can detect an offense without understanding its full scope, and 'the time to determine the loss in a check-kiting scheme is the moment the loss is detected.'" *Id.* (alterations omitted) (quoting *United States v. Mau*, 45 F.3d 212, 216 (7th Cir. 1995)).

As with check kiting, so too with theft. In fact, *Mau*'s rule was in part premised on an equivalency between the two offenses. *See* 45 F.3d at 215 ("[C]heck kiting is not more equivalent to a fraudulent loan transaction than to simple theft." (internal quotation marks omitted)); *id.* at 216 ("[A]s in theft

cases, loss is the value of the money … unlawfully taken."
(citing U.S.S.G. § 2F1.1 n.7)).[6] Here, Lake County knew that
Philpot had improperly taken the bonus money at the time
he returned it. Although the County authorities were not
necessarily aware of the full scope of Philpot's misconduct,
that is not necessary for a victim to detect an offense. The
fact that Philpot "repa[id]" the bonus "after the loss ha[d]
been discovered does not change the fact of the loss; such
fact merely indicates some acceptance of responsibility." *Id.*

Even if the County had not yet detected the offense,
moreover, a defendant does not get credit for returning
money if he knows or should know that the offense is about
to be uncovered. U.S.S.G. § 2B1.1 n.3(E)(i)(II). Philpot re-
turned his bonuses on February 5, 2010. At this point, the
media had already reported that he had wrongfully taken
the IV-D money, and Philpot should have known that gov-
ernment investigators might soon become aware of his con-
duct. We therefore conclude that the district court correctly
calculated Philpot's loss amount at sentencing.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court in
all respects.

---

[6] Today, this inference is even stronger because § 2F1.1 has been re-
pealed and consolidated with § 2B1.1 to provide a unified treatment of
theft, property destruction, and fraud. As the amendment to the guide-
lines notes, "inasmuch as theft and fraud offenses are conceptually simi-
lar, there is no strong reason to sentence them differently." U.S.S.G. App.
C Vol. II 172 (2012) (Amendment 617).